## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **TERRY WILKINS,** | **:** | **Case No. 12-1010** |
| | **:** | |
| **CINDY HUNTSMAN,** | **:** | |
| | **:** | **Judge _____** |
| **MIKE STAPLETON,** | **:** | |
| | **:** | |
| **and** | **:** | **Magistrate _____** |
| | **:** | |
| **SEAN TRIMBACH** | **:** | |
| | **:** | |
| **Plaintiffs,** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **VERIFIED COMPLAINT** |
| **DAVID T. DANIELS, in his official capacity as** | **:** | |
| **Director, Ohio Department of Agriculture,** | **:** | |
| | **:** | |
| **And** | **:** | |
| | **:** | |
| **THE OHIO DEPARTMENT OF** | **:** | |
| **AGRICULTURE** | **:** | |
| | **:** | |
| **Defendants.** | | |

1.     Now come Plaintiffs, TERRY WILKINS, LLC, CINDY HUNTSMAN, MIKE STAPLETON and SEAN TRIMBACH (collectively, the "Plaintiffs"), and for their Complaint against DAVID DANIELS in his official capacity as Director of the OHIO DEPARTMENT OF AGRICULTURE and the OHIO DEPARTMENT OF AGRICULTURE ("ODA"), and state as follows:

## INTRODUCTION

2.     This is an action brought pursuant to 42 U.S.C. §1983 for declaratory judgment, temporary restraining order, preliminary and permanent injunction, and nominal damages arising from the unconstitutional policies and practices of Defendants. As a result of Defendants' policies, practices and custom, as well as certain conduct by one or more Defendants, Plaintiffs have or will suffer irreparable harm to their rights under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The harm may only be remedied by a ruling from this Court.

3.     Defendants threaten to unconstitutionally (1) force Plaintiffs, if they wish to retain the rights to their private property, to join certain politically-motivated private organizations; (2) force Plaintiffs, if they do not join a private organization, to transfer their private property without compensation or in the alternative seize Plaintiffs private property without compensation; (3) deprive Plaintiffs, if they do not join a private organization, of their Procedural Due Process rights to contest the order to perform certain surgical procedures on their animals as a prerequisite to registering them with the state; and (4) deprive Plaintiffs, if they do not join a private organization, of their rights to Equal Protection and Due Process.

4.     Plaintiffs desire to retain their private property interests in their animals without being forced to join and fund certain political organizations, or in the alternative, perform invasive, dangerous, and costly surgical procedures on their animals.

5.    In the alternative, Plaintiffs' desire to retain their fundamental right to obtain compensation for their preexisting ownership rights in their animals, whether from the state, or from private purchasers on the open marketplace.

6.    As a result of the policy, practice and custom of the Defendants, as well as certain conduct by one or more Defendants, Plaintiffs will suffer irreparable harm unless the Defendants are immediately enjoined from restricting their rights in the aforesaid manner.

## PARTIES

7.    Plaintiff Terry John Wilkins is a resident of the State of Ohio who owns a retail store in Columbus. Ohio, "Captive Born Reptiles," which has been in the business of selling reptiles and amphibians since 1994.

8.    Mr. Wilkins has worked with reptiles and amphibians since the 1960s, having traveled to over 19 countries and collected over 100 species of over 1,000 reptiles and amphibians, including exceptionally rare breeds and endangered species, such as bog turtles, Green Anocandas, and St. Lucian Island Boas.

9.    Mr. Wilkins has previously been qualified as an expert witness on the subject of breeding and caring for reptiles and amphibians.

10.    For conservation and humanitarian purposes, Mr. Wilkins does not take and resell animals that have been captured from the wild; he only sells animals that are born and bred in captivity.

11.    Mr. Wilkins wishes to retain his business and his captive-born species of animals, many of which are now regulated under the Act.

12.    Mr. Wilkins does not wish to endanger the health of these animals by subjecting them to "micro-chipping" or "PIT-tagging."

13.    Plaintiff Cyndi Huntsman wishes to avoid seizure and retain possession of her business and her animals without (1) threatening their health through micro-chipping them; (2) being forced to

join a private organization whose views she finds abhorrent; or (3) paying to the state fees and fines that exceed the value of the animals and business.

14.     Ms. Huntsman owns "Stump Hill Farm," an "exotic animal education center" in Massillon, Ohio.

15.     Stump Hill Farm is a non-profit organization dedicated to educating the public about rare and endangered animal species in captivity and in the wild.

16.     The farm is a federally licensed, USDA-inspected facility that also provides rescue and care to animals in need.  Its goal is to raise public awareness that will aid the preservation and propagation of animals that are disappearing from the wild.

17.     The farm cares for a total of 49 animals, such as white tigers, lemurs, leopards, lions, bears, monkeys, chimpanzees, and baboons.  The farms' animals have appeared on television shows with Jack Hanna, Maury Povich, David Letterman, Good Morning America, The Howie Mandel Show, Roseanne Barr, Woodrow the Woodsman, The Fox 8 Morning Show, Critter Gitters, The National Wildlife Federation, Rachel Ray, Jay Leno & Many Others; and they have been used in photo shoots for Vogue, Cosmo, Cosmo Girl, Esquire, Ladies Home Journal & Celebrity Living.

18.     The farm owns and cares for the "Massillon Tiger" that serves as the mascot for Massillon High School.

19.     Mike Stapleton is the owner of Paws & Claws Animal Sanctuary in Prospect, Ohio which provides Tiger and Bear rescue from closing zoos, other sanctuaries that are over crowded or closing and from private owners who can no longer care for them.

20.     Mr. Stapleton is currently caring for 11 animals including 6 bears and 5 tigers.

21.     Mr. Stapleton does not wish to subject his animals to the dangerous PIT tag procedure, does not wish to be forced to join private organizations who have advocated positions of pubic policy he

disagrees with, and does not wish to have his property forcibly removed if he does not comply with the above mandates.

22.    Sean Trimbach is the owner of Best Exotics LLC in Medway, Ohio, a USDA-licensed "alternative livestock farm" which breeds, raises and sells exotic animals.

23.    Best Exotics, LLC currently has a Syrian Brown Bear, two Ringtail Lemurs, an African Serval and 113 Venomous Snakes.

24.    Mr. Trimbach has been an exotic-animal breeder for more than 20 years and does not want to subject his animals to the dangerous PIT tag procedure, does not wish to be forced to join private organizations who have advocated positions of public policy he disagrees with, and does not wish to have his property forcibly removed if he does not comply with the above mandates, especially as this will totally wipe out the substantial monetary investment Mr. Trimbach has made toward building his business.

25.    Plaintiffs and their facilities qualify for American Zoological Association and Zoological Association of America membership.

26.    The Ohio Department of Agriculture is the State of Ohio agency charged with enforcing the laws and rules complained of herein.

## JURISDICTION AND VENUE

27.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as this action arises under the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution; under 28 U.S.C. § 1343(a)(3), in that it is brought to redress deprivations, under color of state law, of rights, privileges, and immunities secured by the United States Constitution; under 28 U.S.C. § 1343(a)(4), in that it seeks to recover damages and secure equitable relief under an Act of Congress, specifically, 42 U.S.C. § 1983, which provides a cause of action for the protection of civil and constitutional rights; under 28 U.S.C. § 2201(a), to secure declaratory relief; under 28 U.S.C. § 2202, to

secure preliminary and injunctive relief and damages; and under 42 U.S.C. § 1988, to award attorneys fees.

## FACTUAL ALLEGATIONS

28.     Venue is proper within this judicial district and division pursuant to 28 U.S.C. § 1391(b) and Local Rule 82.1, as (i) the Defendants are situated within this judicial district and division; and (ii) all of the claims asserted by Plaintiffs arose within this judicial district and division

29.     Prior to June of 2012, ownership and possession of many breeds of animals now banned by the Act was lawful in Ohio, and owners were strictly liable for harm done by their animals.

30.     Capitalizing on the publicity of the "Terry Thompson" or "Zanesville" incident in October of 2011, certain organized interests applied pressure to ban the private ownership of certain breeds of animals in Ohio.

31.     In June 2012 the Ohio General Assembly enacted, and Governor Kasich signed, the "Ohio Dangerous and Wild Animal Act".

32.     The default position of the Act is to divest all owners of nearly all animals identified in the Act of their possessory interests in those animals.

33.     The beginning point of the legislation is to broadly ban, as of January 1, 2014, the acquisition, purchase, sale, and/or transfer of animals identified in R.C. 935.01(C) as a "dangerous wild animal."  R.C. 935.02(B)(1).

34.     To retain possession of his or her previously-lawful animal, the owner of an animal is required to join and fund one of several private membership organizations, or in the alternative, to obtain a "wildlife shelter permit" or "wildlife propagation permit" issued under R.C. 935.07 of the Revised Code.

35.     R.C. 935 requires upon finding an animal without a permit, the government shall seize the animal and/or order it transferred.  R.C. 935.20(A)(3), (B), and (E).

36. The government may impose all costs of the action of seizing an animal, including temporary care of the animal, upon the owner. R.C. 935.20(E).

37. Further, If ODA denies the "wildlife shelter permit" to the owner of the animal, the owner must, if also unsuccessful upon appeal: (1) transfer, within 30 days, all animals that the person possesses to a humane society, wildlife sanctuary, rescue facility, or zoo per R.C. 935.06(F); and (2) Pay all costs associated with the transfer of the animal, pursuant to R.C. 935.06(F).

38. Sale of such animals is explicitly forbidden: "except for [certain kinds of snakes over 12 feet] no person shall sell or offer for sale at auction a dangerous wild animal or restricted snake." R.C. 935.18(B).

39. This leaves uncompensated transfer to certain special interests as the only option: owners may not release animals into the wild, even in their natural habitat on another continent. R.C. 935.19(D) and (E).

40. Further, a government employee may also "destroy" any animal "that is a threat to public safety" without liability. R.C. 935.22. There is no guidance as to what constitutes such a threat.

41. Thus, to avoid total forfeiture of their animal, alongside penalties, an animal owner must (1) "register" their animal; and (2) acquire a permit.

42. While Plaintiffs may well be forced to surrender their property without compensation, an entity that receives this property as a result of its favored position enforced by this offensive regulatory/ban scheme, may turn around and sell said animal for its own profit and benefit.

43. This ODA has required this registration to take place no later than November 5, 2012.

44. Under the Act, to "register" an animal with the state, so as to be eligible to later acquire the permit necessary to retain a possessory interest in one's animal, the owner must first "have permanently implanted in the dangerous wild animal a microchip at the time of registration." R.C. 935.04(D).

45.     There is no process for objecting to the prerequisites to registration, including certain surgical procedures, irrespective of whether they endanger the life or health of the animals, or are otherwise unlawful.

46.     Acquisition of a "wildlife shelter permit" requires the following:

    a.  Proof of financial responsibility, as required below.  935.05(B).

    b.  Proof of two years of experience in the care of the species of animal, or without such proof, passage of a written exam.

    c.  Proof of a "veterinarian-client relationship as prescribed in R.C. 4741.04."

    d.  An annual application fee of $250 to infinity, depending upon the number animals owned (the fee is $1,000 per year for owners with over 11 animals, but $1,000 plus $125 for each animal owned over 15 animals).  935.05(C).

    e.  Maintenance of proof of financial responsibility through "a liability insurance policy with an insurer authorized or approved to write such insurance in this state . . .," or "a surety bond . . . in a form approved by the director of agriculture."  935.05(D)(1). The amount of coverage required is between $200,000 and $1,000,000, depending on the number of animals possessed.  R.C. 935.05(D)(2).

    f.  Compliance with "standards of care established in" ODA rules.  R.C. 935.06(A)(3). (This includes housing and fencing).

    g.  Sterilization of each male animal owned.  935.06(A)(4).

    h.  Sworn testimony that members of the public will be prohibited from coming into contact with the animal.  935.06(A)(5).

    i.  The facility at which the animal resides must be at least one acre in size, unless the animal is a monkey, or the Director of the ODA issues a waiver for the one acre

requirement.  935.06(A)(7).  No standards are supplied to guide the Director's decision-making in whether to issue a waiver.

j.  The owner of the animal must not be convicted of a felony (not all felonies may apply).  935.06(A)(6).

k.  Payment of all costs associated with a BCI criminal records check. 935.06(B).

l.  Full compliance with all "regulations adopted under the federal animal welfare act." R.C. 935.12(B)(1).

m.  A warning sign on each animal's cage.  R.C. 935.18(C)(1).

n.  A warning sign on the entrance to the property where the animal resides.  R.C. 935.18(C)(2).

47.    Pursuant to R.C. 935.07, If the owner wished to breed the animal "solely for the purpose of a species survival program," he must obtain a "wildlife propagation permit." To do this, he must meet all of the above requirements other than sterilization, in R.C. 935.05 and .06.  See 935.07(A).

48.    In addition, fees are higher are between $1,000 and $3,000; and the owner must house the animal on a minimum of a two acre lot, unless the animal is a monkey.

49.    The Act became effective on or about September 5, 2012.

50.    Registration, so as to preserve one's right to acquire a permit to retain their private property, is required by ODA on or about November 5, 2012.

51.    Plaintiffs refuse to implant microchips and sterilize certain breeds of their animals on the basis of adverse effects to their health and safety, and further due to the costliness of the procedures.

52.    Plaintiffs have no recourse by which to safeguard their interests in and for their animals by objecting to the requirement to micro-chip and sterilize their animals.

53.    Micro-chip and sterilization procedures are proven to have adverse health effects on certain breeds of animals owned by Plaintiffs.

54.     In the first year of the Act alone, the costs of complying with the Act exceed the value of any animal under $700 in value.

55.     Over the course of the life of the animal, the costs of complying with the Act exceeds the value of every species of animal owned by Plaintiffs.

56.     Plaintiffs desire to be free from forcing and funding certain private organizations, members of whom are exempt from the Act, whose ideals and political agendas they find objectionable.

57.     For instance, Plaintiffs believe deeply in the private ownership of animals, and the groups who they would be required to join and fund do not.

## CLAIM FOR DECLARATORY JUDGMENT AND INJUNCTION

## (28 U.S.C. § 2201, et seq.)

58.     An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning Plaintiffs' rights under the United States Constitution.  A judicial declaration is necessary and appropriate at this time as to the Counts I below.

59.     Threatened deprivation of constitutional rights that chills speech is a First Amendment harm.[1]

60.     A state actor cannot constitutionally condition the receipt of a benefit, such as a liquor license or an entertainment permit, on an agreement to refrain from exercising one's constitutional rights, especially one's right to free expression and one's right to be free from unlimited warrantless searches of private property without probable cause.[2]

_____

[1]      *United Food & Commercial Workers Local 1099 v. City of Sidney,* 364 F.3d 738 (6th Cir. 2004).

[2]      Id., citing *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697–98, 33 L.Ed.2d 570 (1972) ("For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally

61.     Plaintiffs desire a judicial determination of their rights against Defendants as they pertain to Plaintiffs' right to be free from forced association and funding of causes antithetical to their interests, right to be free from complete seizures of private property without compensation, and right to a hearing before being deprived of important property interests.

62.     In order to prevent further violation of Plaintiffs' constitutional rights by Defendants, it is appropriate and proper that a declaratory judgment be issued, pursuant to 28 U.S.C. § 2201 and FED. R. CIV. P. 57, declaring unconstitutional all relevant portions of the Act.

63.     Furthermore, pursuant to 28 U.S.C. § 2202 and FED. R. CIV. P. 65, it is appropriate and hereby requested that this Court issue preliminary and permanent injunctions prohibiting the Defendants from enforcing all relevant provisions of the Act, to the extent they are unconstitutional, in order to prevent the violation of Plaintiffs' constitutional rights.

---

protected interests—especially, his interest in freedom of speech."); *Keyishian v. Board of Regents,* 385 U.S. 589, 606, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967) (quoting *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963)) ("It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege.").

## COUNT I

## VIOLATION OF RIGHT TO FREE SPEECH AND ASSOCIATION UNDER THE FIRST AND

## FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

### (42 U.S.C. § 1983)

64.     Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein.

65.     The state cannot condition the retention of a citizen's property rights on that citizen's submission to joining and funding a private membership organization whose views the citizen finds objectionable.

66.     "[T]he freedom to join together in furtherance of common political beliefs" is clearly protected by the First Amendment of the Constitution. Cal. Democratic Party v. Jones, 530 U.S. 567, 574, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) (citing Tashjian, 479 U.S. at 214–15, 107 S.Ct. 544). Encompassed within the right to freedom of association is the power of an organization to identify the people who constitute the organization, as well as the right to limit the organization to people who share in the common interest and purpose of the organization. Democratic Party of U.S. v. Wisconsin ex rel. La Follette, 450 U.S. 107, 122, 101 S.Ct. 1010, 67 L.Ed.2d 82.

67.     A corollary of the right to associate is the right not to associate. Jones, 530 U.S. at 574, 120 S.Ct. 2402.  For instance, "[w]hen a government employer requires its employees to associate with a particular private organization, it infringes on its employees' First Amendment associational rights and on liberty rights protected by the Fourteenth Amendment. See Abood, 431 U.S. at 222, 97 S.Ct. 1782; Hudson, 475 U.S. at 301, 106 S.Ct. at 1073.

68.     To be valid, state laws forcing association must provide legitimate alternatives that do not restrict freedom of association. See Jones, 530 U.S. at 577, 120 S.Ct. 2402; Miller v. Brown, 503 F.3d 360 (4th Cir.2007).

69. Plaintiffs would be exempt from the burdens of the act if they become "accredited members" of the Association of Zoos and Aquariums ("AZA") or the Zoological Association of America ("ZAA").

70. Here, the alternative to the ban -- becoming a member of the AZA or ZAA -- is not legitimate. First, Plaintiffs may attempt to perform experimental medical research on their animals or become a "circus." Second, they may adhere to a set of regulatory requirements that punishes them financially and destroys the value of their investment.

71. However, these organizations are highly political, and costly to join, should they even choose to have Plaintiffs as members. regardless of merit or qualification.

72. The ZAA has publicly advocated for the Act, and "the principles" behind it, which include a ban on private ownership of animals not belonging to AZA or ZAA members.[3]

73. Further, the ZAA "has never endorsed dangerous wild animals as pets under any circumstances."[4]

74. The ZAA demands a considerable initiation and annual membership fee, which it then uses for purposes include lobbying against Plaintiffs' property interests.

75. AZA and its members directly lobby against the interests of Plaintiffs, indicating that further regulation of Plaintiffs is needed to protect the public health, and that their private ownership of their animals should be banned.

76. Further, the AZA "dictates participation in certain conservation programs."[5]

77. Further, AZA demands accreditation and membership fees, which it then uses to lobby against the interest of individuals like the Plaintiffs.

---

[3]    See ZAA testimony of Alan Smith, in favor of the Ohio Dangerous and Wild Animals Act, before the Ohio Senate Agriculture, Environment & Natural Resources Committee, March 21, 2012.
[4]    Id.
[5]    Id.

78.    Forcing Plaintiffs to associate with and fund the speech and activities of the AZA and ZAA, in order to retain their property rights in their animals, violates their speech and associational rights under the First Amendment to the United States Constitution.

## COUNT II

## VIOLATION OF PROCEDURAL DUE PROCESS

## (42 U.S.C. § 1983)

79.    Plaintiffs hereby incorporate by reference the allegations in the foregoing paragraphs as if set forth fully herein.

### Animals are Property Under Ohio Law

80.    "In order to make a successful claim under the Takings and Due Process Clauses, Plaintiffs must establish first that they possess a constitutionally protected property interest." Neifert v. Dept. of the Environment (2006), 395 Md. 486, 522, 910 A.2d 1100, citing Ruckelshaus v. Monsanto Co. (1984), 467 U.S. 986, 1000–1001, 104 S.Ct. 2862, 81 L.Ed.2d 815; Beasley v. Flathead Cty. (2009), 350 Mont. 177, 2009 MT 121, 206 P.3d 915, ¶ 13 ("takings claims require a plaintiff first to demonstrate that it possesses a constitutionally protected property interest").

81.    To be sure, property, for purposes of the Takings and Due Process Clauses, "encompasses more than the physical object owned." McNamara v. Rittman, 107 Ohio St.3d 243, 2005-Ohio-6433, 838 N.E.2d 640, ¶ 24–25.

82.    In Toledo v. Tellings, the Supreme Court of Ohio stated "It is undisputed that citizens enjoy the right to own dogs, and in State v. Anderson (1991), 57 Ohio St.3d 168, 566 N.E.2d 1224, we recognized the special relationship that often exists between owners and dogs. We remarked that '[t]o many, a pet dog is as important and as loved as * * * human members of the family.' Id. at 170, 566 N.E.2d 1224. Thus, most dog owners consider their pet to be more than a mere thing, and the ownership

of it constitutes a valuable right. Regardless, however, of the possibility of strong sentimental attachment, a dog is still property."[6]

## Property rights are "fundamental rights" in Ohio

83.     The rights to acquire, use, enjoy, and dispose of property are among the most revered in our nation's law and traditions and are integral to our theory of democracy and notions of liberty. Norwood v. Horney, 110 Ohio St.3d 353, 2006-Ohio-3799, 853 N.E.2d 1115, ¶ 34.

84.     [T]he founders of our state expressly incorporated individual property rights into the Ohio Constitution in terms that reinforced the sacrosanct nature of the individual's "inalienable" property rights, Section 1, Article I, which are to be held forever "inviolate." Section 19, Article I.

85.     Declaratory and Injunctive Relief is Appropriate to Prevent Deprivation of Private Property.

86.     Under substantive Ohio law, property owners in Ohio have the right to bring cases contesting the constitutionality of a regulations and takings of property.  Goldberg Cos., Inc. v. Richmond Hts., 81 Ohio St.3d 207, 690 N.E.2d 510.

87.     It is well settled that "[a]ctions for declaratory judgment may be predicated on constitutional or nonconstitutional grounds." State ex rel. Ohio Civ. Serv. Emps. Assn., AFSCME, Local 11, AFL–CIO v. State Emp. Relations Bd., 104 Ohio St.3d 122, 2004-Ohio-6363, 818 N.E.2d 688, ¶ 13.

88.     "'Persons whose property rights are directly affected by a statute or ordinance are entitled to obtain a declaratory determination as to the validity of the statute or ordinance.' " Moore v. Middletown, Butler C.P. No. CV 2008 09 4191, at 5, quoting Wilson v. Cincinnati, 171 Ohio St. 104, 108, 168 N.E.2d 147 (1960).

---

[6]     State v. Cowan (2004), 103 Ohio St.3d 144, 814 N.E.2d 846; Toledo v. Tellings (2007), 114 Ohio St.3d 278, 871 N.E.2d 1152.

89.     "A primary purpose of the declaratory-judgment action is to serve the useful end of disposing of uncertain or disputed obligations quickly and conclusively." Ohio Farmers Indemn. Co. v. Chames, 170 Ohio St. 209, 213, 163 N.E.2d 367 (1959).

90.     Supreme Court of Ohio precedent also makes clear that declaratory relief is available to a plaintiff who can show that (1) a real controversy exists between the parties, (2) the controversy is justiciable, and (3) speedy relief is necessary to preserve the rights of the parties. Haig v. Ohio State Bd. of Edn., 62 Ohio St.3d 507, 511, 584 N.E.2d 704 (1992); Burger Brewing Co. v. Ohio Liquor Control Comm., 34 Ohio St.2d 93, 97, 296 N.E.2d 261 (1973).

91.     Plaintiffs are entitled to bring this action to defend their property rights under federal and state substantive law.

**Procedural Due Process**

92.     The right to procedural due process is found in the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution. State v. Hayden, 96 Ohio St.3d 211, 2002-Ohio-4169, 773 N.E.2d 502, ¶ 6.

93.     Although the concept is flexible, at its core, procedural due process under both the Ohio and United States Constitutions requires, at a minimum, an opportunity to be heard when the state seeks to infringe a protected liberty or property right. Boddie v. Connecticut (1971), 401 U.S. 371, 377, 91 S.Ct. 780, 28 L.Ed.2d 113.

94.     Further, the opportunity to be heard must occur at a meaningful time and in a meaningful manner. Mathews v. Eldridge (1976), 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18; Hochhausler, 76 Ohio St.3d at 459, 668 N.E.2d 457.

95.     The right to procedural due process is conferred not by legislative grace, but by constitutional guarantee. Thus, while the legislature may elect not to confer a particular property right, it may not constitutionally authorize the deprivation of a property interest, once conferred, without

appropriate procedural safeguards. Arnett v. Kennedy (1974), 416 U.S. 134, 167, 94 S.Ct. 1633, 40 L.Ed.2d 15 (Powell, J., concurring in part).FN2.

96.     It is undisputed that citizens enjoy the right to own animals, and in State v. Anderson (1991), 57 Ohio St.3d 168, 566 N.E.2d 1224, the Supreme Court of Ohio recognized "the special relationship that often exists between owners and dog," remarked that "[t]o many, a pet dog is as important and as loved as * * * human members of the family." Id. at 170, 566 N.E.2d 1224. Thus, most dog owners consider their pet to be more than a mere thing, and the ownership of it constitutes a valuable right. Regardless, however, of the possibility of strong sentimental attachment, a dog is still property."

97.     This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. Wolff v. McDonnell, 418 U.S. 539, 557-558, 94 S.Ct. 2963, 2975-2976, 41 L.Ed.2d 935 (1974). See, e. g. Phillips v. Commissioner of Internal Revenue, 283 U.S. 589, 596-597, 51 S.Ct. 608, 611-612, 75 L.Ed. 1289 (1931). See also Dent v. West Virginia, 129 U.S. 114, 124-125, 9 S.Ct. 231, 234, 32 L.Ed. 623 (1889).

98.     The "right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." Joint Anti-Fascist Comm. v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring).

99.     In State v. Cowan, the Supreme Court of Ohio held the imposition of the "vicious" or "dangerous" label upon a dog, and its attendant regulatory burdens, without a meaningful hearing, to violate the procedural due process rights of the owners.  103 Ohio St.3d 144, 814 N.E.2d 846.

100.     The Mathews test requires this court to consider: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest, through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and

(3) "the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substantive procedural requirements would entail."

101.    The Act requires owners of animals characterized as "dangerous wild animals" under the act to implant a microchip or "PIT tag" in their animal before they may register their animal, so as to keep it.

102.    If an animal owner does not implant a microchip in his animal, he loses the right to retain it entirely, because he cannot register it, and unregistered animals are to be seized by the state.

103.    Implantation of microchips or PIT tags poses risk of serious physical harm to many species of animals characterized as "dangerous wild animals" under the Act, including death, sterility, and cancer.

104.    The type of "Passive Integrated Transponder," or "PIT" tag required by the Ohio Department of Agriculture includes toxic lithium.

105.    The State of Ohio does not maintain "readers" for non-lithium tag because they are too expensive.

106.    Many "PIT" Tags without lithium are still toxic, emitting a charge for an extended period of time.

107.    The PIT tag moves through the animal's body, often becoming lodged in the animal's rib cage, and dangerously close to internal organs.

108.    Veterinarians are not trained to microchip reptiles, or any kind of exotic animal.

109.    Microchipping is a "surgical procedure."

110.    Anesthesia is required to implant a microchip in an animal, and poses its own set of costs and risks.

111.    The cost of implanting a microchip in some types of animals exceeds the value of those animals.

112.    The Act does not supply a procedure for objecting to or obtaining exemption from the requirement that all "dangerous wild animals" be micro-chipped in order for the owner's ownership interest to continue.

113.    Reptile and Amphibian veterinarians currently refuse to microchip reptiles, due to concerns over the health of the animal, leaving owners of these animals with no means of having the requisite microchip implanted, so as to preserve their property interest under the law.

114.    The Act does not supply animal owners with the opportunity to address the impossibility of implanting a microchip into their animals prior to having to implant that microchip.

115.    Due to the costs, threats, and harms associated with (1) implanting a microchip into certain animals; and (2) sterilizing certain animals, which the Act requires if one is to retain his property interest in the animal, the Act effects a deprivation of property without an adequate hearing, in contravention of Plaintiffs' rights under the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio Constitution.

**Impermissible Permanent Physical Occupation**

116.    In addition to imposing costs on the owner of the animal and threatening the health of the animal, the forced implantation of a microchip into the animal is a permanent physical occupation of that animal, and consequently, the owners' property.

117.    Where government requires an owner to suffer a permanent physical invasion of her property-however minor-it must provide just compensation. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking).

118.    The Court has held that physical takings require compensation because of the unique burden they impose: A permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property-perhaps the most

fundamental of all property interests. See Dolan v. City of Tigard, 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994); Nollan v. California Coastal Comm'n, 483 U.S. 825, 831-832, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987); Loretto, supra, at 433, 102 S.Ct. 3164; Kaiser Aetna v. United States, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

119.    In Gilbert, the Supreme Court of Ohio concluded "[t]here was sufficient evidence here to establish that the city directly encroached upon the Gilberts' property by depositing sewage in the creek that flows through their property. The pump station had overflowed on at least 79 days between 1998, when Richard Gilbert purchased the property, and 2008. The sewer district's own employees testified that when the pump station overflowed, the sewage went into the creek."

120.    Further, in Gilbert, because the sewage overflows were directed at the Gilberts' property, a taking occurred even in the absence of physical displacement. See McKee v. Akron (1964), 176 Ohio St. 282, 285, 27 O.O.2d 197, 199 N.E.2d 592, overruled on other grounds by Haverlack v. Portage Homes, Inc. (1982), 2 Ohio St.3d 26, 2 OBR 572, 442 N.E.2d 749 ("A taking may also be found where it is clear that the injury sustained by a person differs substantially in kind from that sustained by others in the neighborhood, even though there has been no physical displacement. Thus a person might recover by showing that the damage was directed at his particular property").

121.    R.C. 935.04(A) requires that "A person that possesses a dangerous wild animal on the effective date of this section shall register the animal with the director of agriculture * * * not later than 60 days after the effective date of this section."

122.    Thus, the statute requires registration on or about November 5, 2012.

123.    "A person that registers a dangerous wild animal under this section shall have permanently implanted in the dangerous wild animal a microchip at the time of registration. . ."  R.C. 935.04(D).

124.     Thus, a person who wishes to retain possession of their animal may only do so if they implant a microchip in their animal by November 5, 2012.

125.     The owners of animals are thus required to pay the costs of having a microchip permanently surgically implanted onto their property.

### Taking without compensation

126.     A second categorical takings rule applies to regulations that completely deprive an owner of "all economically beneficial us[e]" of her property. Lucas, 505 U.S., at 1019, 112 S.Ct. 2886.

127.     Regulatory takings challenges are governed by the standards set forth in Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).

128.     The Court in Penn Central acknowledged that it had hitherto been "unable to develop any 'set formula' " for evaluating regulatory takings claims, but identified "several factors that have particular significance." Id., at 124, 98 S.Ct. 2646.

129.     Primary among those factors are "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." Ibid. In addition, the "character of the governmental action"-for instance whether it amounts to a physical invasion or instead merely affects property interests through "some public program adjusting the benefits and burdens of economic life to promote the common good"-may be relevant in discerning whether a taking has occurred. Ibid.

130.     The Penn Central factors-though each has given rise to vexing subsidiary questions-have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or Lucas rules. See, e.g., Palazzolo v. Rhode Island, 533 U.S. 606, 617-618, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001); id., at 632-634, 121 S.Ct. 2448 (O'CONNOR, J., concurring).

131.     Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain.

Accordingly, each of these tests focuses directly upon the severity of the burden that government imposes upon private property rights.

132.    In the Lucas context the complete elimination of a property's value is the determinative factor. See Lucas, supra, at 1017, 112 S.Ct. 2886 (positing that "total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation").

133.    And the Penn Central inquiry turns in large part, albeit not exclusively, upon the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests.

134.    Here, to retain possession of their animal, the owner of an animal is required to join a private organization he or she objects to, or obtain a "wildlife shelter permit" or "wildlife propagation permit" issued under R.C. 935.07 of the Revised Code.

135.    R.C. 935 requires upon finding an animal without a permit, the government shall seize the animal and/or order it transferred.  R.C. 935.20(A)(3), (B), and (E).  And the government may imposes all costs of this action, including temporary care of the animal, upon the owner.  R.C. 935.20(E).

136.    Further, If ODA denies the "wildlife shelter permit" to the owner of the animal, the owner must, if also unsuccessful upon appeal:  (1) transfer, within 30 days, all animals that the person possesses to a humane society, wildlife sanctuary, rescue facility, or zoo per R.C. 935.06(F); and (2) Pay all costs associated with the transfer of the animal pursuant to R.C. 935.06(F).

137.    Sale of such animals is explicitly forbidden: "except for [certain kinds of snakes over 12 feet] no person shall sell or offer for sale at auction a dangerous wild animal or restricted snake."  R.C. 935.18(B).

138. This leaves uncompensated transfer to certain special interests as the only option: owners may not release animals into the wild, even in their natural habitat on another continent. R.C. 935.19(D) and (E).

139. Further, any government employee may also "destroy" any animal "that is a threat to public safety" without liability. R.C. 935.22. There is no guidance as to what constitutes such a threat.

140. While Plaintiffs may well be forced to surrender their property without compensation, an entity that receives this property as a result of its favored position enforced by this offensive regulatory/ban scheme, may turn around and sell said animal for its own profit and benefit.

141. Thus, to avoid total forfeiture of their animal, alongside penalties, an animal owner must acquire a permit.

142. A "wildlife shelter permit" requires the following:

    a. Proof of financial responsibility, as required below. 935.05(B).

    b. Proof of two years of experience in the care of the species of animal, or without such proof, passage of a written exam.

    c. Proof of a "veterinarian-client relationship as prescribed in R.C. 4741.04" (forced association).

    d. An annual application fee of $250 to $1,000. 935.05(C).

    e. Maintenance of proof of financial responsibility through "a liability insurance policy with an insurer authorized or approved to write such insurance in this state . . .," or "a surety bond . . . in a form approved by the director of agriculture." 935.05(D)(1). The amount of coverage required is between $200,000 and $1,000,000, depending on the number of animals possessed. R.C. 935.05(D)(2).

    f. Compliance with "standards of care established in" ODA rules. R.C. 935.06(A)(3). (This includes housing and fencing).

    g.  Sterilization of each male animal owned.  .06(A)(4).

    h.  Sworn testimony that members of the public will be prohibited from coming into contact with the animal.  .06(A)(5).

    i.  The facility at which the animal resides must be at least one acre in size, unless the animal is a monkey, or the Director of the ODA issues a waiver for the one acre requirement.  .06(A)(7).  No standards are supplied to guide the Director's decision-making in whether to issue a waiver.

    j.  The owner of the animal must not be convicted of a felony (not all felonies may apply).  .06(A)(6).

    k.  Payment of all costs associated with a BCI criminal records check. 935.06(B).

    l.  Full compliance with all "regulations adopted under the federal animal welfare act." R.C. 935.12(B)(1).

    m.  A warning sign on each animal's cage.  R.C. 935.18(C)(1).

    n.  A warning sign on the entrance to the property where the animal resides.  (C)(2).

143.    Pursuant to R.C. 935.07, If the owner wished to breed the animal "solely for the purpose of a species survival program," he must obtain a "wildlife propagation permit." To do this, he must meet all of the above requirements other than sterilization, in R.C. 935.05 and .06.  See 935.07(A).

144.    The test for a regulatory taking must "'compare the value that has been taken from the property with the value that remains in the property' " (quoting Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602, 644, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) .

145.    In each of Plaintiffs' cases, the Act imposes costs associated with the retention of animals that exceeds the value of the animals.

146.    The cost of tranquilizing and micro-chipping an animal alone can exceed $300.

147.    The cost of tranquilizing and sterilizing an animal alone can exceed $300.

148.    Moreover, the Plaintiffs cannot sell their animals.

149.    Thus, the Plaintiffs only options are to fund a private political organization or have their animals seized.

150.    The Act effects a taking of property without compensation, a permanent physical occupation of their property without compensation, forced association, and deprivation of procedural due process.

151.    As a legal consequence of the Defendants' violation of Plaintiffs' First, Fourth, and Fourteenth Amendment rights, as alleged above, Plaintiffs are entitled to injunctive relief.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against Defendants and that the Court:

Declare that the imposition of the burdens of (1) joining and funding the objectionable views of a private organization; (2) having one's private property seized; or (3) obtaining and maintaining a license under Chapter 935 of the Ohio Revised Code are unconstitutional on their face and as applied to Plaintiffs because they violate the rights to freedom of speech, private property, and due process of law guaranteed under the First, Fifth, and Fourteenth Amendments to the Constitution;

Issue a preliminary and permanent injunction against the Defendants prohibiting the enforcement of said policies against Plaintiffs and others.

Issue a preliminary injunction prohibiting Defendants from taking adverse action against Plaintiffs and others in response to Plaintiffs and others' abstention from "registering" their animals with Defendants on or before November 5, 2012.

Award Plaintiffs nominal damages against Defendants;

Pursuant to 42 U.S.C. §1988 and other applicable law, award Plaintiffs their costs and expenses incurred in bringing this action, including their reasonable attorneys' fees; and

Grant such other and further relief as the Court deems equitable, just, and proper.


Respectfully submitted,
**OWENS LAW OFFICE**


**/s/ Robert Owens**

Robert M. Owens (0069866)
46 North Sandusky Street, Suite 202
Delaware, OH 43015
(740) 368-0008
(740) 368-0007 (fax)
*robert@owenslawoffice.com*
Attorney for Plaintiffs