UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

TERRY WILKINS, ET AL.,

                              Plaintiffs,

          v.                                              CASE NO. 2:12-CV-01010-GCS

DAVID T. DANIELS, ET AL.,

                              Defendants,

and

THE HUMANE SOCIETY OF THE UNITED STATES
2100 L Street, NW
Washington, DC 20037

                              Intervening Defendant.

## MOTION TO INTERVENE AND
## POINTS AND AUTHORITIES IN SUPPORT THEREOF

The Humane Society of the United States ("Humane Society") hereby moves to intervene

in this lawsuit as a defendant as of right pursuant to Fed. R. Civ. P. 24(a)(2), or, alternatively, for

the right to permissively intervene under Fed. R. Civ. P. 24(b)(1)(B). The Humane Society is a

nonprofit organization with more than 488,000 members and supporters in the State of Ohio, and

is dedicated to preventing animal cruelty, promoting conservation, and eliminating the public

safety threats posed by dangerous wild animals possessed by unqualified persons; as such, the

Humane Society was an active proponent of the law challenged by Plaintiffs (SB 310, Ohio's

Dangerous Wild Animal Act, or "DWA Act").

The Humane Society contacted counsel for State Defendants and Plaintiffs to inquire

about the parties' positions on this motion, but given the timing of the telephone conference

tomorrow, Proposed Defendant-Intervenor decided to file the instant motion before obtaining a formal position from the parties on this motion.

In support of this motion, the Humane Society presents the following Memorandum of Points and Authorities and attached declarations and exhibits.

## I. INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 24, the Humane Society respectfully moves to intervene in the above-captioned matter – a challenge to invalidate duly-enacted sections of the Ohio Revised Code regarding the possession, sale, and breeding of dangerous wild animals (such as big cats, bears, primates) and restricted snakes (i.e., venomous snakes and large constrictor snakes). The Humane Society has a direct and immediate interest in the subject matter of the litigation, as disposition of this action could cause significant harm to the Humane Society's interests in preventing animal cruelty, promoting conservation, and protecting public safety. *See* Declaration of Debra L. Leahy ("Leahy Decl."); Declaration of Karen Minton ("Minton Decl."). As explained below, the Humane Society satisfies the requirements for intervention as of right and permissive intervention, and can provide critical and unique legal, scientific, and practical perspectives on the matter should the court decide to grant this motion.

## II. FACTUAL BACKGROUND

### A. Private Possession of Dangerous Wild Animals Undermines Animal Welfare, Conservation, and Public Safety

This nation is currently facing an epidemic of unqualified individuals and facilities possessing dangerous wild animals, venomous snakes, and large constrictor snakes, which threatens both public safety and animal welfare and undermines conservation efforts to protect endangered species. *See, e.g.,* Rich Schapiro, *All It Takes Is $45,000 and a Phone Call to Get a Pet Chimp*, N.Y. Daily News (February 22, 2009); Peter Laufer, *Exotic Animals as Pets: An*

*Unregulated Risk*, N.Y. Times (Oct. 20, 2011). Tens of thousands of big cats, bears, primates, venomous snakes, large constricting snakes and other dangerous wild animals currently live in backyards, basements, and other substandard facilities across the country. *See, e.g.,* Keith Thomson, *It's Not Just Chimps: Americans Have 7,000 Pet Tigers*, Huffington Post (Feb. 18, 2009) (quoting an exotic pet owner as saying "Tigers are the new pit bulls."). Ohio has long been a hotbed for the exotic pet trade because the state previously had no laws to specifically address the possession, sale, or breeding of dangerous wild animals and reptiles. *See* Leahy Decl., Exhibit D; Minton Decl., ¶5; The Plain Dealer, *Wild Animals are Big Business in Ohio* (June 1, 2006).

The public safety threat posed by exotic pets was illustrated perfectly in October 2011 when a disturbed Zanesville, Ohio man released nearly 50 big cats, bears, and primates from his backyard menagerie, leading to dozens of animals being killed in order to protect the surrounding community. *See* Greg Bishop & Timothy Williams, *Police Kill Dozens of Animals Freed on Ohio Reserve*, N.Y .Times (Oct. 19, 2011); Leahy Decl., ¶7. Residents were warned to stay in their homes, a sign on the interstate cautioned drivers to stay in their cars, and schools were closed. *Id.* Even if there is not an intentional release of dangerous wild animals, neighbors, visitors, service personnel, and emergency first responders are all put in direct danger if these animals are not being kept in secure facilities. The Humane Society's compilation of dangerous incidents reported in news articles and government documents since 1990 shows that Ohio ranks third among the 50 states in dangerous incidents involving big cats, bears, and primates that resulted in injury or death. Leahy Decl., Exhibit D. Just in Ohio, since 1990, 34 people, including 11 children, suffered injuries and one person was killed by these dangerous mammals. *Id. See also* P.J. Nyhus, R.L. Tilson, and J.L. Tomlinson, *Dangerous Animals in Captivity: Ex Situ Tiger*

*Conflict and Implications for Private Ownership of Exotic Animals*, Zoo Biology Vol. 22, 573-586 (2003) (study finding that tigers are 360-720 times more likely to be involved in a fatal attack than dogs). Similarly, news articles indicate that, since 2003, one Ohio man was strangled to death by his pet python and two others died after being bitten by captive venomous snakes. Leahy Decl., Exhibit D.

Exotic pets can also pose a risk to public health. For example, a recent study confirms that "an exotic animal may harbour a raft of potentially infective microbes and macroparasites making any animal a possible Trojan Horse of infection and infestation." Clifford Warwick et al., *A Review of Captive Exotic Animal-Linked Zoonoses*, J. of Env. Health Research Vol. 12(1) (2012). Popular species of exotic pets are known to carry numerous bacterial, viral, fungal, and parasitic pathogens. *See* The National Association of State Public Health Veterinarians, *Compendium of Measures to Prevent Disease Associated with Animals in Public Settings*, CDC Morbidity and Mortality Weekly Report, Vol. 60(4) (May 6, 2011); E.C. Chen et al, *Cross-Species Transmission of a Novel Adenovirus Associated with a Fulminant Pneumonia Outbreak in a New World Monkey Colony*, PLoS Pathology Vol 7(7), e1002155- (July 2011).

Dangerous wild animals and restricted snakes have specialized needs that are exceedingly difficult to meet in captivity. These species typically require vast spaces, natural habitats, specialized diets, exercise, and opportunities to express natural behaviors such as foraging, hunting, socializing, climbing, digging, denning, and exploring. *See, e.g.,* Devra G. Kleiman, Katerina V. Thompson & Charlotte Kirk Baer (Eds.), Wild Mammals in Captivity: Principles and Techniques for Zoo Management (2nd ed., 2010). Accredited zoos and bona fide wildlife sanctuaries spend considerable resources to provide animals with an enriched environment to alleviate profound boredom and psychological distress, but the same cannot be said of

unqualified individuals who cage these species in Ohio backyards, garages, and basements. *See* Leahy Decl., Exhibit D. *See also* Association of Zoos and Aquariums, Accreditation Standards and Related Policies (2013), *available at* http://www.aza.org/uploadedFiles/Accreditation/Accred%20Standards%20(with%20elephants)(1).pdf.

Exotic pets usually spend their lives—often decades—in small barren cages, living on concrete or hard compacted dirt, and are denied even the basic necessities of adequate food, shelter, veterinary care, and companionship. They develop an array of captivity-induced health problems and neurotic behaviors as a result of living in grossly sub-standard conditions. For example, scientists have found significantly higher stress levels in caged carnivores who in the wild would roam vast territories. *See* Ros Clubb & Georgia Mason, *Captivity Effects on Wide-Ranging Carnivores*, Nature Vol. 425, 473 (Oct. 2, 2003).

Dangerous wild animals (including many endangered species) are bred irresponsibly with no regard for genetic integrity or consideration of the immense resources required to provide adequate lifetime care for these often long-lived animals. *See* Leahy Decl., ¶8. Legitimate sanctuaries cannot take in all of the unwanted animals that unmanaged breeding produces – these facilities are nearly filled to capacity and often struggle to maintain the financial support necessary to meet the growing demand for unwanted animals. *See, e.g.,* Chris Dixon, *Last 39 Tigers Are Moved From Unsafe Rescue Center*, N.Y. Times (June 11, 2004); John Christoffersen, *Owners Struggle to Find Sanctuaries for Chimps*, MSNBC (May 14, 2009).

Substandard breeders frequently prematurely and forcibly separate infants (including big cats, bears, and primates) from their mothers, which deprives them of a normal biological and behavioral development, and allows the infant to be hand-reared and groomed for a lifetime of

human interaction. *See* Leahy Decl., ¶8; Association of Zoos and Aquariums, *White Paper: Apes in Media and Commercial Performances*, *at* http://www.aza.org/white-paper-apes-in-media-and-commercial-performances/. Dangerous animals are even subjected to abusive training and painful declawing or de-fanging procedures in a futile attempt to make them safe for human interaction once they mature. For example, Plaintiff Huntsman's facility, Stump Hill Farm, was recently cited by the U.S. Department of Agriculture for declawing a juvenile tiger in violation of the Animal Welfare Act.[1] *See* U.S. Department of Agriculture, Inspection Report for License No. 31-C-0050, Repeat Violation of 9 C.F.R. § 2.40(b)(2) (Nov. 8, 2011) ("This licensee had a juvenile tiger born at the facility declawed on both front feet. The declawing of any wild or exotic carnivore does not constitute appropriate veterinary care….These procedures are not innocuous and can cause ongoing pain, discomfort, or other pathological conditions in the animals.").

In addition to these public safety and animal welfare concerns, exotic pet ownership undermines conservation efforts. Many popular exotic pets (such as tigers, leopards, grizzly bears, and gibbons) are listed as threatened or endangered under the federal Endangered Species Act. *See* 16 U.S.C. § 1540(e), (h); 50 C.F.R. § 17.11. Exotic pet ownership undermines conservation efforts by decreasing public awareness about the plight of endangered species, decreasing donations to conservation programs, and potentially contributing to illegal wildlife trade. *See* Steve R. Ross et al., *Inappropriate Use and Portrayal of Chimpanzees*, Science vol. 319, pg. 1487 (2008); Stephen R. Ross et al., *Specific Image Characteristics Influence Attitudes*

---

[1] Note, however, that the federal Animal Welfare Act does <u>not</u> apply to exotic pet owners who do *publicly exhibit* their animals (7 U.S.C. § 2133); thus, many large carnivores in private ownership could be subjected to this painful procedure without any oversight unless state laws address the possession and treatment of dangerous wild animals.

*about Chimpanzee Conservation and Use as Pets*, PLoS One 6(7) (July 13, 2011); Kara Schroepfer et al., *Use of "Entertainment" Chimpanzees in Commercials Distorts Public Perception Regarding Their Conservation Status*, PLoS One 6(10) (Oct. 12. 2011); Association of Zoos and Aquariums, Primate Advisory Group, *Primate Pet Trade Position Statement*, *available at* http://www.lpzoo.org/chimp-ssp/AZA_statement.pdf; World Wildlife Fund, *Tigers Among Us: The Impact of Poorly Regulated Captive Tigers in the United States on Tigers in the Wild*, http://www.worldwildlife.org/species/finder/tigers/captive-tigers/WWFBinaryitem18371.pdf; D.F. Williamson & L.A. Henry, *Paper Tigers: The Role of the U.S. Captive Tiger Population in the Trade in Tiger Parts*, TRAFFIC North America and World Wildlife Fund (2008), *available at* http://www.traffic.org/home/2008/7/31/paper-tigers-us-regulations-on-captive-tigers-flawed.html.

    B.   History of Humane Society Efforts to Reform Ohio Law Concerning Dangerous Wild Animals

    In June 2010, in recognition of the significant concerns described above, then-Governor Ted Strickland agreed to address the issue of exotic pet ownership in Ohio, and in January 2011 Governor Strickland issued an Executive Order (#2010-17S) that established emergency regulations to restrict the possession and sale of dangerous wild animals (specifically big cats, bears, wolves, nonhuman primates, large constricting and venomous snakes, and crocodilians). *See* Humane Society, *Ohio Rule Issued to Prohibit Dangerous Wild Animals as Pets* (Jan. 6, 2011), *available at* http://www.humanesociety.org/news/press_releases/2011/01/ohio_exotic_pet_rule_010611.html. The Executive Order directed the Ohio Department of Natural Resources ("ODNR") to adopt permanent regulations to address existing owners and to limit new acquisition by unqualified

entities. The ODNR declined to adopt permanent regulations before the emergency regulations expired in April 2011 and Ohio's new Governor, John Kasich, chose not to extend the Executive Order, leaving Ohio as one of fewer than 10 states with virtually no regulation of private ownership of dangerous wild animals. *See* Leahy Decl., Exhibit D; Humane Society, *The HSUS Names 5 Worst States for Exotic Pets* (March 18, 2009), *available at* http://www.humanesociety.org/news/press_releases/2009/03/worst_exotic_pet_states_031809.html.

In April 2011, the Humane Society released a detailed report entitled "Ohio's Fatal Attractions: An Overview of Captive Wildlife Issues in Ohio" (Leahy Decl., Exhibit D) and in July 2011, the Humane Society began participating in a stakeholder Work Group established by ODNR in order to consider how to regulate dangerous wild animals in Ohio. *See* Leahy Decl., Exhibit C (Ohio Department of Natural Resources, Recommended Regulations of Dangerous Wild Animals (Nov. 30, 2011)).

On October 19, 2011, Humane Society staff were on the ground in Zanesville following the intentional release of approximately 50 dangerous wild animals by Terry Thompson, and the Humane Society worked to try to prevent the return of the surviving animals to the deceased owner's widow. *See* Leahy Decl., ¶7. Because Ohio's law did not prevent Mr. Thompson or his widow from possessing dangerous wild animals, Mrs. Thompson did eventually bring several big cats, a bear, and a monkey back to the Thompson property. *See* CNN, *Freed Exotic Animals Returned to Ohio Widow* (May 4, 2012) *available at* http://www.cnn.com/2012/05/04/us/ohio-animals-return/index.html.

In March 2012, Ohio State Senator Troy Balderson introduced S.B. 310, the Dangerous Wild Animal Act. The Humane Society's Ohio State Director worked in support of the legislation and the Humane Society designated significant organizational resources to promoting passage of the bill. *See* Minton Decl., ¶¶5-6; Leahy Decl., ¶10. On May 22, 2012, the Ohio General Assembly passed SB 310 – the Ohio House of Representatives voted 87 to 9 in favor of the bill and the Ohio Senate voted 30 to 1 in favor of the bill. The DWA Act prohibits new acquisition of dangerous wild animals, ensures that existing owners will provide adequate care to dangerous wild animals, and regulates the possession of restricted snake species.

C. <u>Interests of Proposed Defendant-Intervenor</u>

The Humane Society is the nation's largest animal protection organization with over 11 million members and constituents, including over 488,000 in Ohio. The Humane Society works to protect all animals through education, investigation, litigation, legislation, advocacy, and field work. The Humane Society actively works to improve the management of wildlife in captivity in order to promote animal welfare, conservation, and public safety. *See* Minton Decl., ¶8; Leahy Decl., ¶¶4-6. Humane Society members regularly visit zoos accredited by the Association of Zoos and Aquariums ("AZA") and sanctuaries accredited by the Global Federation of Animal Sanctuaries ("GFAS") and enjoy seeing animals who are well cared for and appropriately displayed, but are distressed when they view animals being mistreated or exhibited at substandard exhibition facilities in a manner that jeopardizes public safety and conservation efforts. The Humane Society also operates five animal care centers that provide care to thousands of animals, including big cats rescued from a substandard backyard menagerie. *See* Minton Decl., ¶7; Leahy Decl., ¶9.

The Humane Society actively advocates against animal cruelty and in favor of sensible public policies that reduce animal suffering and promote wildlife and habitat protection. The Humane Society has spent decades protecting endangered species, and has recently established a campaign specifically focused on ending the private ownership and unmanaged breeding of dangerous wild animals in captivity. *See* Minton Decl., ¶8; Leahy Decl., ¶1. The Humane Society was involved in the development and drafting of the DWA Act, and the organization expended significant resources in order to ensure the law's passage; thus, Humane Society members and staff who spend time and other resources researching and advocating for protection of captive wildlife, for example by attending committee hearings and contacting their legislators, would be adversely affected if the DWA Act is overturned. *See* Minton Decl., ¶¶5,8; Leahy Decl., ¶¶9, 12.

## III. THE HUMANE SOCIETY IS ENTITLED TO INTERVENE AS A MATTER OF RIGHT

Fed. R. Civ. P 24(a) governs intervention as of right and states, in pertinent part, that "[o]n timely motion, the court must permit anyone to intervene who...claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest."

This Circuit has interpreted Rule 24(a) as establishing a four-prong test that must be satisfied in order for the district court to grant intervention as of right: (1) the application for intervention is timely; (2) the applicant has a substantial legal interest in the action; (3) the applicant's ability to protect that interest may be impaired in the absence of intervention; and (4) the existing parties do not adequately represent the applicant's interest. *United States v.*

*Tennessee,* 260 F.3d 587, 591 (6th Cir.2001), citing *Mich. State AFL-CIO v. Miller,* 103 F.3d 1240, 1245 (6th Cir.1997); *Cuyahoga Valley Ry. Co. v. Tracy,* 6 F.3d 389, 395 (6th Cir.1993).

### A.   This Motion to Intervene is Timely

To determine whether a motion to intervene is timely, this Circuit considers: (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention. *See Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir.1990).

The Humane Society acted as quickly as possible to intervene so that the organization might protect its substantial interests in this matter.  Indeed, this motion is being filed just a few weeks after the complaint was filed and before any dispositive motions have been decided. The state defendants have not yet filed an answer or first responsive pleading.  *See Miller*, 103 F.3d at 1247 ("…timeliness is not a problem here. The intervention motion was filed just two weeks after the complaint, and the case was obviously in its initial stage."); *Great Am. Assur. Co. v. Travelers Prop. Cas. Co.*, No. 1:06-CV-378, 2007 U.S. Dist. LEXIS 4124, at *5-6 (S.D. Ohio Jan. 19, 2007) (holding that a motion to intervene filed two-and-a-half months after the complaint was timely); *Chubb Ins. Co. of Eur. SE v. Zurich Am. Ins. Co.,* No. 1:09-MC-0116, 2010 U.S. Dist. LEXIS 7200, at *11 (N.D. Ohio Jan. 28, 2010) ("[G]iven the rapidity with which movants entered the case . . . the minimal resources expended [so far] in litigating the case, and the absence of prejudice to [plaintiffs] in granting the motion, the . . . motion to intervene [is] timely.").

Neither Plaintiff nor Defendant will be harmed by granting this motion at this early stage in the litigation. The Humane Society intervention will not prejudice the existing parties nor cause any delay in the proceedings.

B. The Humane Society Has a Substantial Legal Interest in This Case

As required, the Humane Society has a "substantial legal interest in the case." *Miller*, 103 F.3d at 1245. The Sixth Circuit has adopted "'a rather expansive notion of the interest sufficient to invoke intervention of right.'" *Providence Baptist Church v. Hillandale Comm., Ltd.*, 425 F.3d 309, 315 (6th Cir. 2005), quoting *Miller*, 103 F.3d at 1245; *see also Bradley v. Milliken*, 828 F.2d 1186, 1192 (6th Cir. 1987) ("'[I]nterest' is to be construed liberally."). Most notably, "an intervenor need not have the same standing necessary to initiate a lawsuit in order to intervene in an existing district court suit…" *Id.* The Court also has "'reject[ed] the notion that Rule 24(a)(2) requires a specific legal or equitable interest.'" *Miller*, 103 F.3d at 1245, quoting *Purnell v. City of Akron*, 925 F.2d 941, 948 (6th Cir. 1991). Furthermore, "'close cases should be resolved in favor of recognizing an interest under Rule 24(a).'" *Grutter v. Bollinger*, 188 F.2d 394, 399 (6th Cir. 1999), quoting *Miller*, 103 F.3d at 1247.

The Sixth Circuit has previously recognized the right of an organization to intervene in litigation challenging the validity of a statute when the organization was a vital participant in the political process that resulted in legislative adoption. *See Miller*, 103 F.3d at 1247 (recognizing the Ninth Circuit's rule that a public interest group that is involved in the process leading to adoption of legislation has a cognizable interest in defending that legislation, citing *Idaho Farm Bureau Fed'n v. Babbitt,* 58 F.3d 1392, 1397 (9th Cir.1995)).[2]

---

[2] Indeed, the Humane Society has previously intervened in many other federal and state cases that challenged animal protection laws on Constitutional grounds, in cooperation with and

The Humane Society undeniably has an interest in upholding the DWA Act because the Humane Society was an active proponent of the legislation, directly participating in policy discussions to develop a legislative framework, analyzing proposed legislative language, and promoting passage of the bill. The Humane Society expended substantial organizational resources to develop support for the DWA Act, through various methods intended to educate Ohio legislators and to educate and mobilize Ohio citizens to affirmatively urge their legislators to pass the law. *See* Minton Decl., ¶¶5-6; Leahy Decl., ¶10.

Further, "[e]ven the precedential effect of an adverse decision on future possible litigation will suffice" as an interest sufficient for allowing intervention. *See, e.g., Esseltine v. Maxx,* No. 08-14542, 2007 U.S. Dist. LEXIS 58276, at *3 (E.D. Mich. July 9, 2009); *Miller, 103 F.3d at 1247*. This case marks the first constitutional challenge to a state dangerous wild animal law, and many states are currently considering adopting similar laws to address the problem of private possession of dangerous wild animals. The Humane Society is expending resources to support passage of those laws and, therefore, the precedential nature of this lawsuit could have an impact on the organization's other legislative efforts and future possible litigation concerning those legislative efforts.

Similarly, the U.S. Supreme Court has recognized that organizations are injured by an action that "perceptibly impair[s]" the organization's ability to carry out its activities. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). The Humane Society has significant

---

without duplicating the State defendants' efforts. *See, e.g., Chinatown Neighborhood Association v. Brown, et al.*, No. 4:12-cv-03759 (N.D. Cal.); *JS West Milling Co., Inc. v. California*, No. 10-04225 (Cal. Sup. Ct. Fresno County); *Cramer v. Brown, et al.*, No. 2:12-cv-03130 (C.D. Cal.); *Asian Am. Rights Comm. v. Brown et al.*, No. 12-517723 (Cal. Sup. Ct., San Francisco County); *Nat'l Audubon Soc'y, et al. v. Gray Davis, et al.*, No. 3:98-cv-04610 (N.D. Cal.); *Mary Mendibourne, et al. v. John McCamman, et al.*, No. 46349 (Cal. Sup. Ct. Lassen County); *Citizens for Responsible Wildlife Management v. State,* No. 72186-6 (Sup. Ct. of Wash.).

continuing organizational interests at stake here. The Humane Society engages in direct advocacy, public education efforts, and other activities to shed light on the perils facing captive wildlife, and to effectuate policy changes across the country that will result in better protections for dangerous wild animals in private ownership. The Humane Society has diverted substantial time, funds, and other resources to address the particularly cruel and devastating practice of private possession, breeding, and sale of exotic pets. *See* Minton Decl., ¶8; Leahy Decl., ¶4, 11. These limited resources could otherwise be used to address other captive wildlife priorities of the organization.

Organizations may also intervene in litigation on behalf of their members to protect their members' legal interests. *See Dow Chem. Co. v. Taylor*, 519 F.2d 352, 353 (6th Cir. 1975); *Youngblood v. Dalzell*, 925 F.2d 954, 957 n.1 (6th Cir. 1991). The Humane Society's members and supporters have direct and immediate aesthetic and recreational interests in viewing captive wildlife in humane conditions and devote substantial time to the observation, study, and photography of these animals. More importantly, Humane Society members living in Ohio do not want to face threats to their health and safety from dangerous wild animals kept by individuals who cannot secure these magnificent but inherently dangerous species.[3] Humane Society members living in Ohio do not want to fear for their safety and want to be able to enjoy their property free from the threat of escaped predators roaming residential neighborhoods. Proposed Defendant-Intervenor and its members and supporters also dedicate resources and

---

[3] In another high-profile incident just one year prior to the mass release in Zanesville, another Ohio man, Brent Kandra, died after being attacked by a 500-pound black bear kept at a private menagerie. *See* The Plain Dealer, *Elyria man dies after being mauled by showman's pet bear* (Aug. 20, 2010). Mr. Kandra's mother, Deirdra Herbert, has become an advocate for improving Ohio's laws regarding dangerous wild animals so that her family's tragic story is not repeated. *See* Leahy Decl., Exhibit B.

effort toward ensuring the conservation, safety, health, and well-being of the wildlife that they enjoy viewing. Finally, Humane Society members specifically donate to the organization to support lobbying efforts on the state and federal level.

### C. This Action Threatens to Impair The Humane Society's Interests

"[A] would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied. This burden is minimal." *Miller*, 103 F.3d at 1247, citing *Purnell*, 925 F.2d at 948; *see also Northeast Ohio Coal. for the Homeless v. Blackwell*, 467 F.3d 999, 1007 (6th Cir. 2006) ("The Supreme Court has emphasized that the requirement of impairment of a legally protected interest is a minimal one:").

If the Court enjoins the DWA Act, the Humane Society's extensive advocacy, legal, staffing, and monetary commitments to its passage and preservation would be nullified and their organizational interests will be adversely affected. The Humane Society is a nonprofit organization that has had to divert and commit precious organizational resources – resources which would otherwise have been used to address other animal protection and conservation issues – in order to specifically address the cruel and deleterious issue of exotic pets in Ohio. *See* Minton Decl., ¶8; Leahy Decl., ¶10. Because Ohio is itself a significant market and hotspot for exotic pets, the DWA Act provides a concrete and substantial benefit to the Humane Society, freeing up limited resources that have been diverted from other priority organizational activities to address captive wildlife.  Conversely, if the law is overturned, the Humane Society will have to continue to divert and deplete its limited organizational resources to address the practice of exotic pet ownership in Ohio.  Further, if the DWA Act is overturned, the public is less likely to accept the need for additional protections for captive wildlife, and generally less likely to

support—financially and otherwise— the organizational activities and goals of the Humane Society.

If the DWA Act were held unconstitutional, private possession, breeding, and sale of exotic animals would remain legal in Ohio, and animal welfare, conservation, and public safety would continue to be undermined, subjecting Humane Society members to the possibility of viewing or encountering privately owned dangerous wild animals kept in substandard conditions.

### D. No Existing Party Adequately Represents the Humane Society's Interests

Intervenors are required to make only a "minimal" showing of the requirement that their interests may not be adequately represented by the existing parties. *Blackwell*, 467 F.3d at 1007; *Linton,* 973 F.2d at 1319; *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972) ("the burden of making that showing should be treated as minimal."). "[I]t is sufficient to prove that representation may be inadequate. A would-be intervenor is not required to show that the current representation will in fact be inadequate." *Blackwell*, 467 F.3d at 1008; *see also Miller*, 103 F.3d at 1247-48. This requirement "is satisfied if the intervenor can show that there is substantial doubt about whether his interests are being adequately represented by an existing party to the case." *Bd. of Trs. of the Ohio Laborers' Fringe Benefit Progs. v. Ford Dev. Corp.,* No. 2:10-CV-0140, 2010 U.S. Dist. LEXIS 86492, at *9 (S.D. Ohio Aug. 20, 2010).

The Sixth Circuit repeatedly has held that a putative intervenor is not required to make "'a stronger showing of inadequacy'" just because it seeks to intervene on the same side as government officials or agencies. *Stupak-Thrall v. Glickman*, 226 F.3d 467, 479 (6th Cir. 2000), quoting *Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th Cir. 1999).

The Humane Society's interests diverge in important respects from those of State Defendants, and are not "adequately represented by existing parties." Fed. R. Civ. P. 24(a).

Specifically, while the State Defendants' interest is in the administration of their legal obligations on behalf of the general public, the Humane Society has a broader interest in advocating for prevention of cruelty to animals, conservation of endangered species, and protection of public safety, as well as the effectiveness of its organizational activities. *See* Minton Decl., ¶3; Leahy Decl., ¶¶3, 11.

As the result of decades of experience both litigating and advocating for the humane treatment of animals and conservation of ecosystems, the Humane Society brings to bear extensive factual and legal knowledge that is not shared by State Defendants. The Humane Society is well-versed in the process for accreditation by both the Association of Zoos and Aquariums and the Zoological Association of America, frequently evaluates conservation justifications alleged by facilities possessing dangerous wild animals, and can rebut claims regarding the alleged intentions and actions of the so-called animal rights movement. Indeed, the presence of the Humane Society will ensure that the Court has a full understanding of the underlying issues that are relevant to its decision in this matter.

Importantly, the Humane Society is the ideal party to explain to the Court the humane, public safety, and conservation interests that drove the passage of the DWA Act. As proponents of SB 310 with extensive experience observing and protecting wildlife, and unique knowledge of the humane and public safety concerns raised by private possession of dangerous wild animals, the Humane Society has substantial expertise with respect to issues squarely before the Court in this litigation.

Moreover, in light of the substantial time, effort, and resources that the Humane Society committed to the passage and implementation of the DWA Act, a ruling striking down the law could have a significant impact on the Humane Society's pecuniary and reputational interests.

*See* Minton Decl., ¶9; Leahy Decl., ¶12. The Humane Society is a non-profit entity and its advocacy and educational efforts are donation dependent. The Humane Society is funded in part by private donations, and its ability to generate continued donor support depends heavily on the success of its efforts to further the humane treatment of animals, conservation of endangered wildlife, and protection of public safety, consistent with their members' and constituents' interests. It follows that if the legislative achievements of the Humane Society —like the DWA Act—are overturned, the organization will lose much needed financial support. The State Defendants do not and cannot possibly share these interests with the Proposed Defendant-Intervenor because the state does not stand to lose financial or other support based on whether or not the law stands.

Similarly, the Humane Society has and continues to support legislative and regulatory changes in states that have weak laws pertaining to dangerous wild animals. Thus, this case of first impression could significantly impact, as a precedential matter, the Humane Society's continuing work on this issue. The State's ultimate objective is upholding the DWA law, regardless of the reasoning or findings of the court. Conversely, because the Humane Society is supporting similar laws in other states, both within and outside the Sixth Circuit, the Humane Society has an interest in the specific findings of the court regarding, for example, Plaintiffs' claims of property interests in as yet unattained animals.

Because the Humane Society more than meets the "minimal" showing necessary for this factor, and also satisfies all other requirements under Rule 24(a), this Court should grant this motion to intervene as of right.

## IV.    IN THE ALTERNATIVE, THE COURT SHOULD GRANT THE HUMANE SOCIETY PERMISSIVE INTERVENTION

Although the Humane Society satisfies the criteria for intervention of right under Rule 24(a), in the alternative, this Court should exercise its discretion and allow the applicants to intervene permissively under Rule 24(b).

Rule 24(b) provides, "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). It further specifies, "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Id. R. 24(b)(1)(3). "A motion for permissive intervention under Rule 24(b) is directed to the sound discretion of the district judge." *Sec'y of Dep't of Labor v. King*, 775 F.2d 666, 668 (6th Cir. 1985). "[P]ermissive intervention under Rule 24(b) is to be liberally granted." *Morocco v. Nat'l Union Fire Ins. Co.*, No. 2:03-CV-523, 2003 U.S. Dist. LEXIS 17918, at *9 (S.D. Ohio Oct. 9, 2003); *accord Wellington Res. Group, LLC v. Beck Energy Corp.*, No. 2:12-CV-00104, 2012 U.S. Dist. LEXIS 101999, at *6-7 (S.D. Ohio July 23, 2012).

The Humane Society's defenses and the claims raised by Plaintiffs clearly have questions of law and of fact in common. Indeed, the Humane Society's principal defenses will be based on arguments as to the insufficiency of the legal claims raised by the Plaintiffs.  To the extent any factual development is necessary for the resolution of the claims raised in this lawsuit, the Humane Society is in an excellent position to address those facts – e.g., the necessity of, and rationale underlying, the DWA Act – as a participant in the Work Group established by ODNR to help develop the law, and the primary organization instrumental in passing the legislation.

The State Defendants in this case are charged with *enforcing* the Law, whereas the Humane Society was involved in drafting the bill and highlighting the justifications for the law,

prior to its passage. The Humane Society's factual knowledge is unique and could prove crucial to resolution of the specific claims raised by Plaintiffs. At the same time, the Humane Society's participation will not enlarge the issues in the litigation beyond those raised by the original parties.

Therefore, the Humane Society respectfully requests that it be allowed to intervene pursuant to Fed. R. Civ. P 24(b) if this Court denies the Humane Society's request for intervention as of right.

## V. CONCLUSION

WHEREFORE, The Humane Society of the United States respectfully prays that this Honorable Court grant its Motion to Intervene. The Humane Society intends to file a proposed opposition to Plaintiffs' motion for preliminary injunction by December 3, 2012.

November 27, 2012

Respectfully Submitted,

/s/ DONALD J. McTIGUE
_____
Donald J. McTigue (0022849)
*Trial Counsel*
Mark A. McGinnis (0076275)
J. Corey Colombo (0072398)
McTigue & McGinnis LLC
545 East Town Street
Columbus, Ohio 43215
Tel: (614) 263-7000
Fax: (614) 263-7078
dmctigue@electionlawgroup.com
mmcginnis@electionlawgroup.com
ccolombo@electionlawgroup.com


Anna Frostic* (IL Bar No. 6289518)
Ralph Henry* (D.C. Bar No. 982586)
The Humane Society of the United States
2100 L Street NW Washington, D.C. 20037

Phone (734) 717-2925; Fax (202) 676-2357
*Pro Hac Vice Motions forthcoming*

*Attorneys for Proposed Intervenor*

### Certificate of Service

I hereby certify that the foregoing was electronically filed with the U.S. District Court, Southern District of Ohio, on November 27, 2012 and served upon all parties of record via the court's electronic filing system.

/s/ Mark A. McGinnis_____
Mark A. McGinnis (OH 0076275)