# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**TERRY WILKINS,** *et al.*,

        **Plaintiffs,**

-v-                                 **Case No.: 2:12-cv-1010**
                                             **JUDGE SMITH**
                                             **Magistrate Judge Kemp**

**DAVID T. DANIELS,** *et al.*,

        **Defendants.**

## OPINION AND ORDER

This case involves a constitutional challenge to the Ohio Dangerous Wild Animals and Restricted Snakes Act, Ohio Revised Code §§ 935.01 – 935.99.  This matter is before the Court on Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 3).  The briefing has been completed and an evidentiary hearing was held December 10-12, 2012.  The parties agree that all the necessary facts and evidence, as well as the applicable law, are before the Court, and that this action is ripe for full adjudication on its merits.  After review of the parties' arguments, the Court has agreed to consolidate the evidentiary hearing with a trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure.  For the reasons that follow, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary/Permanent Injunction is **DENIED**.

## I.      BACKGROUND

After consideration of the parties' submissions, the admissible evidence, and the

applicable law, the Court makes the following findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.[1]

### A.    The Plaintiffs

The Plaintiffs in this case are all owners of multiple breeds of exotic animals and are seeking relief from enforcement of the Ohio Dangerous Wild Animals and Restricted Snakes Act ("the Act").  Plaintiff Cyndi Huntsman owns "Stump Hill Farm," an exotic animal education center in Massillon, Ohio.  Stump Hill Farm is a non-profit organization dedicated to educating the public about rare and endangered animal species in captivity and in the wild.  Stump Hill Farm is a federally licensed, USDA-inspected facility that also provides rescue and care to animals in need.  Its goal is to raise public awareness that will aid the preservation of animals that are disappearing from the wild.  The farm cares for a total of 49 animals, such as white tigers, lemurs, leopards, lions, bears, monkeys, chimpanzees, and baboons.  The farm's animals have appeared on television shows with Jack Hanna, Maury Povich, David Letterman, Good Morning America, The Howie Mandel Show, Roseanne Barr, Woodrow the Woodsman, The Fox 8 Morning Show, Critter Gitters, The National Wildlife Federation, Rachel Ray, Jay Leno & many others; and they have been used in photo shoots for Vogue, Cosmo, Cosmo Girl, Esquire, Ladies Home Journal & Celebrity Living. The farm owns and cares for the "Massillon Tiger" that serves as the mascot for Massillon High School.  (Compl. ¶¶ 13-18).

Plaintiff Huntsmen testified that she has thirty-two years of hands-on experience with the types of animals subject to this Act.  She believes that none of the exceptions to a ban on the

---

[1]To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such; and likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

animals applies to her.  She does not agree with the political views of the Association of Zoos and Aquariums ("AZA") or the Zoological Association of America ("ZAA"), nor does she want to microchip[2] her animals, which is required to seek a Wildlife Shelter Permit.  She acknowledged that she has registered all 36 of her animals that are subject to the Act and has purchased microchips for each of them, but she has not implanted the chips into the animals. Plaintiff Huntsmen expressed concern for the safety of all of her animals if required to implant them with microchips.  She discussed two specific animals that are very old, an African serval and an African lion.  According to her treating veterinarian, subjecting them to anesthesia to implant a microchip could endanger their lives.  Dr. Jo Anne Green who testified for Plaintiffs confirmed that it would be "malpractice" to put the serval and lion under anesthesia (Tr. at 59). She further opined that "it would be cruel and unjustified to anesthesize these animals for the sole purpose of putting in a PIT tag."  (Tr. at 61).

Plaintiff Huntsmen estimates the value of her property to be around $73,400 based on the ages of the animals and whether they are breedable.  (Tr. at 32).  After this Act was implemented, she now estimates the value of her property to be zero because she can no longer sell any of her animals, nor can she move her animals to be able to do the photo shoots, TV shows, and similar events.  (Tr. at 33-35).  Plaintiff Cyndi Huntsmen further testified that it is not economically feasible to meet the requirements to seek a permit under the Act to be able to retain her animals.  She estimates the costs to be $116,290 to accommodate the provisions of the Act.  (Tr. at 33-36).

---

[2] The Act specifically references a microchip, however, testimony regarding this procedure also called it a PIT tag.

Plaintiff Terry Wilkins is a resident of the State of Ohio who owns a retail store in Columbus, Ohio, "Captive Born Reptiles," which has been in the business of selling reptiles and amphibians since 1994.  Mr. Wilkins has worked with reptiles and amphibians since the 1960s, having traveled to over 19 countries and collected over 100 species of over 1,000 reptiles and amphibians, including exceptionally rare breeds and endangered species, such as bog turtles, green anacondas, and St. Lucian Island Boas.  Mr. Wilkins took a herpetology course while enrolled at The Ohio State University.  He has previously been qualified as an expert witness on the subject of breeding and caring for reptiles and amphibians and provided some expert testimony in this case. For conservation and humanitarian purposes, Mr. Wilkins does not take and resell animals that have been captured from the wild; he only sells animals that are born and bred in captivity.  Mr. Wilkins wishes to retain his business and his captive-born species of animals, many of which are now regulated under the Act.  (Compl. ¶¶ 7-12).  Mr. Wilkins currently possesses 29 reticulated pythons, 15 alligators, 10 Burmese pythons, 8 green anacondas, and 3 African rock pythons that are subject to this Act.  (Tr. at 200).  He does not hold any licenses, nor is he a member of AZA or ZAA.  His opinion of these organizations is that they are "hindrances to the propagation of endangered species worldwide.  Their programs aren't consistent with the preservation of these animals."  (Tr. at 203).

Plaintiff Wilkins describes that the cost of complying with the regulations set forth in the Act exceeds the commercial value of the animals, rendering it economically infeasible to retain possession of the animals.  Mr. Wilkins wishes to retain and breed his animals, rather than sterilize them.  He testified that to be able to meet the State's requirements for cages, he "would be required to build caging that would be about six times the sizes of my current caging" and

-4-

"wouldn't fit inside my retail stores" (Tr. at 220).  He further opined based on his training, experience and work in the field of herpetology, that bigger cages are not better for snakes, "[y]ou would kill the animals putting them in those cages."  "These animals are ambush predators.  This animal does not go hunting for its food like a wolf or tiger or bear, what have you.  They wait for the food to come to them.  That animal's home range is going to encompass the territory that it needs to catch the food it needs to catch, to breed when it needs to breed, what have you.  The home range of a lot of these animals amounts to a few feet." (Tr. at 220-21).  Additionally, in over-sized cages, there is a problem keeping the reptiles hot and humid. (Tr. at 221).

Additionally, he opined that microchipping is dangerous to animals, specifically his reptiles in that it could cause them to go sterile.  (Tr. at 216-17).  He further described how dangerous and difficult it would be to insert the 14 gauge needle with the microchip into a baby alligator.  He stated that "there is not much room on that animal to put that tag up underneath the skin.  So, you are going to end up going inside the ribcage, inside of the tail, and that's a 14-gauge needle." (Tr. at 213).

Plaintiff Mike Stapleton is the owner of Paws and Claws Animal Sanctuary in Prospect, Ohio which provides tiger and bear rescue from closing zoos, other sanctuaries that are overcrowded or closing, and from private owners who can no longer care for them.  He is currently caring for 11 animals, including 6 black bears and 5 tigers.  (Compl. ¶¶ 19-21).  He is not a breeder or seller, nor does he make any profit from his animals.  (Tr. at 146).  Mr. Stapleton testified that he registered his animals with the State and has implanted microchips in his animals.  (Tr. at 146-148).  He personally injected his animals with the microchips without using

anaesthesia because they trust him.  However, he would not have recommended that anyone else do this.  Mr. Stapleton expressed concern that he registered his animals and planned to keep then, but the caging standards set forth in the emergency rules came out after he registered. Now, he does not believe there is any way he can meet the new standards that have been promulgated under the law.  (Tr. at 147).  He further stated that despite the fact that the standards for the AZA or ZAA are less stringent, he would not join those organizations because they want to tell him how to take care of his animals.  (Tr. at 150).

Plaintiff Sean Trimbach is the owner of Best Exotics LLC in Medway, Ohio, an Ohio Department of Natural Resources ("ODNR"), USDA-licensed "alternative livestock farm" which breeds, raises, and sells exotic animals.  Best Exotics currently has a Syrian brown bear, 2 ringtail lemurs, an African serval, and 113 venomous and constrictor snakes.  (Am. Compl. ¶¶ 26-28).  His business is not open to the public.  (Tr. at 192).  Mr. Trimbach testified that his animals that are subject to the Act were microchipped by a veterinarian.  Two of his animals, the bear and the serval, were anesthetized to insert the microchip.   (Tr. at 194-95).  He described that all his animals are young to middle age and in good health.  (Tr. at 195).  He testified that he is not a member of the ZAA or ZAZ and would prefer not to be.  (Tr. at 192).  He further testified that under the Act, the carnivore portion of his business will be completely shut down and the reptile end will be able to function to a point.  (Tr. at 196).

Plaintiff Cyril Viestra of Wilkesville, Ohio, personally owns tigers, hyenas, a bobcat and a spider monkey.  (Tr. at 163).  He testified that he is an associate member of ZAA and AZA, which involves paying dues, but he is not a full member because he has not sought accreditation. He described his property and where his animals are kept, including an island facility for his

spider monkey. Mr. Viestra's property is not open to the public and does not generate any money from his animals. He testified that his spider monkey has a microchip, however, he is concerned with microchipping his hyenas because "they're very nervous animals and their skin is much different than that of other animals." (Tr. at 167-68).

Plaintiff Robert Sawmiller of Wapakoneta, Ohio, is a wildlife exhibitor who hold licenses with ODNR and USDA. He has bears, cougars, wolves, and a lynx that are subject to the Act. (Tr. at 116). Mr. Sawmiller has registered all of his wild animals subject to the Act. He included a microchip number assigned to each animal, but he has not inserted the microchips. (Tr. at 132-33). He has been an exotic animal owner for over 20 years and has extensive experience with them. (*Id*.). He runs Wildlife on Wheels, that travels around the United States doing fairs, festivals and corporate events. He also does school and nursing home shows free of charge. His annual profits are typically in the $70,000 range, but this year should be around $110,000.

Mr. Sawmiller displayed many pictures of people (adults and children) holding various exotic animals. He testified that this Act will completely put him out of business. (Tr. at 127). Additionally, he said it would be impossible for him, as an exhibitor, to be a member of either ZAA or AZA–unless he limits his exhibit to only schools, he would not qualify. (Tr. at 121).

Mr. Sawmiller testified that he currently has a bear that is 22 years old and a wolf that is 15 years old and like Ms. Huntsmen, he is concerned for their safety if forced to submit them to anaesthesia to microchip these animals. Also, Mr. Sawmiller currently has a bear named Chloe that he received from a woman who decided to give up the bear after determining she could not meet the requirements under the Act. He testified that Chloe has not transitioned well and will

not eat.  He would like to transport her back to her original owner, but he stated that he now cannot transfer the bear under the Act.  (Tr. at 128-30).

Plaintiff Steve Frantz of Smithville, Ohio, currently owns five rattlesnakes and has had venomous snakes for about thirty years.  He owns these snakes strictly as a hobby; he does not generate any income from them.  (Tr. at 154).  He is an associate member of the ZAA and AZA for educational purposes.  (Tr. at 155-56).  He further testified that if he were required to PIT tag his snakes, he could not find a veterinarian who would do venomous snakes.  (Tr. at 157-58).

Defendant-Intervenor The Humane Society of the United States ("Humane Society")[3] is a non-profit organization with more than 488,000 members and supporters in the State of Ohio, and is dedicated to preventing animal cruelty, promoting conservation, and eliminating the public safety threats posed by dangerous wild animals possessed by unqualified persons; as such, the Humane Society was an active proponent of the Act challenged by Plaintiffs.

**B.     The Ohio Dangerous Wild Animals and Restricted Snakes Act**

In June 2012, the Ohio General Assembly enacted, and Governor Kasich signed, the Ohio Dangerous Wild Animals and Restricted Snakes Act.  The legislation is designed to regulate the acquisition, purchase, sale, and/or transfer of animals identified in Ohio Revised Code § 935.01(C) as a "dangerous wild animal."[4]  The Ohio Department of Agriculture and its Director, David Daniels are charged with enforcement of the Act.

_____

[3] The Humane Society moved to intervene in this case on November 27, 2012 (Doc. 9). Plaintiffs opposed the Motion.  The Court granted the Intervenor's Motion on December 3, 2012 (Doc. 22).

[4] When referencing dangerous wild animals in this Opinion and Order, the Court is referring to the dangerous wild animals identified in this section and covered by this Act.

The Act provides that all individuals and facilities possessing dangerous wild animals prior to September 5, 2012, must register with the Ohio Department of Agriculture by November 5, 2012. *See* Ohio Rev. Code § 935.04. In order to maintain an adequate database and track these exotic animals, the Act requires that each registered dangerous wild animal be microchipped at the time of registration. *See* Ohio Rev. Code § 935.04(D). Beginning January 1, 2012, the Act generally prohibits a person from possessing a dangerous wild animal as defined in the Act. *See* Ohio Rev. Code § 935.01(C) (defining "dangerous wild animal"); Ohio Rev. Code § 935.02 (prohibiting possession of dangerous wild animal). The Act contains numerous exceptions to which the prohibition in section 935.02 does not apply. The following categories of entities are exempt: facilities accredited by the AZA or the ZAA; research facilities as defined in the federal Animal Welfare Act; research facilities accredited by the Association for the Assessment and Accreditation of Laboratory Animal Care International; a circus; a wildlife sanctuary; a wildlife rehabilitator permitted by Ohio Department of ODNR; a person issued a permit by ODNR pursuant to O.R.C. § 1533.08 for scientific or educational use; a person issued a permit by ODNR pursuant to O.R.C. § 1531.25 for native threatened species; a veterinarian providing temporary care; a person transporting a dangerous wild animal or restricted snake through the state; an education institution displaying a dangerous wild animal as a sports mascot; a mobility impaired person possessing certain primate species; a deaf person possessing certain primate species; and a blind person possessing certain primate species. *See* Ohio Rev. Code § 935.03(B).

A person that possesses a dangerous wild animal and plans to continue to possess the animal after January 1, 2014, may obtain a wildlife shelter permit. *See* Ohio Rev. Code §

935.05.  The permit applicant is required to provide: (1) his/her name, date of birth, address, and other relevant identifying information; (2) the name and address of the location where each dangerous wild animal will be confined; (3) a description of each dangerous wild animal, including the scientific and common names, the name that the applicant has given the animal, the animal's sex, age, color, and weight, and any distinguishing marks or coloration that would aid in the identification of the animal; (4) the identification number of the microchip that is implanted in each dangerous wild animal and the frequency of the passive integrated transponder contained in the microchip as required in 935.04; (5) proof of financial responsibility; (6) proof that the applicant has at least two years of experience in the care of the species of dangerous wild animals that are the subject of the application, or in the alternative the applicant must pass a written examination regarding the care of dangerous wild animals; (7) a plan of action to be undertaken should a dangerous wild animal escape; (8) proof that the applicant has established a veterinarian-client relationship as described in O.R.C. § 4741.04 with regard to each dangerous wild animal; (9) an application fee; and (10) any additional information required in the rule.

Additionally, Ohio Revised Code § 935.06(A) requires compliance with standards of care for the animals, including an acreage requirement for certain dangerous wild animals, and sterilization of each male animal unless medically contraindicated as determined by a veterinarian.

Once a permit is submitted, it must be reviewed within 90 days.  If the permit is denied, the Director must notify the applicant of the grounds for denial and the right to adjudication under Ohio Revised Code Section 119.  *See* Ohio Rev. Code § 935.06.

The Director is also charged with ensuring compliance with the Act and the rules[5] promulgated thereunder.  *See* Ohio Rev. Code § 935.17.  If the Director determines that a violation of Chapter 935 or the rules has occurred, the Director may suspend or revoke any permit issued under Chapter 935.  *See* Ohio Rev. Code § 935.13.  Just as with the application process, any person adversely affected by an order of suspension or revocation of a permit may request an administrative hearing under Section 119.

If an animal does not have a permit, or otherwise fall under an exception under the Act, the Director shall seize the animal and/or order it transferred.  *See* Ohio Rev. Code 935.20(A)(3), (B), and (E).  In doing so, the government may impose all costs of the action of seizing an animal, including temporary care of the animal, upon the owner.  *See* Ohio Rev. Code 935.20(E).  The Act does provide if an owner is not able to obtain a permit, or otherwise meet an exception, the owner must: (1) transfer, within 30 days, all animals that the person possesses to a humane society, wildlife sanctuary, rescue facility, or zoo per Ohio Revised Code § 935.06(F); and (2) pay all costs associated with the transfer of the animal, per Ohio Revised Code § 935.06(F).

Pursuant to the Act, the Director may also assess a civil penalty against any person the Director determines is not in compliance with Chapter 935 or the promulgated rules.  Any person assessed a civil penalty has the opportunity for an administrative hearing under Section 119.  *See* Ohio Rev. Code § 935.24(B).

---

[5]  Temporary rules for the housing and care of dangerous wild animals were signed into law by Governor John Kasich on November 27, 2012 in Executive Order 2012-18K.  The rules were written and adopted in accordance with the Act and were approved by the Dangerous and Restricted Animals Advisory Board at its October 31, 2012 meeting.

### C.    Witness Testimony

In addition to the individual Plaintiffs whose testimony is discussed above, Plaintiffs'

counsel presented the following witnesses: William Coburn, owner of Safari Adventures and

Wild Acres Ranch in Sandusky, Ohio; Dr. Jo Ann Green, D.V.M. and accredited with the

USDA; Polly Britton, legislative agent for the Ohio Association of Animal Owners, and Scott

Zody, Chief of the Division of Wildlife in the Ohio Department of Natural Resources.  On

rebuttal, Plaintiffs called John Moore, who was the caretaker of the animals at the Thompson

farm in Zanesville, Ohio, to rebut the testimony of Defendants' witness, Sheriff Lutz.

Mr. Coburn testified that he has been in the exotic animal business since he graduated

from college.  He was previously an AZA zoo director in a facility in northern Ohio.  He is the

current director and owner of a ZAA-accredited facility.  He testified regarding his relationship

with the AZA and ZAA.  He described that the AZA is made up mostly of municipality-run

facilities, that are generally large.  And the ZAA is comprised of mostly private owners.  (Tr. at

9).  He generally described the extensive application requirements and membership.  He also

described that both organizations require high levels of animal care, veterinary medicine,

education, research, and conservation.  (Tr. at 10-11).  Mr. Coburn also opined that "the

standards the State has adopted or brought forward are more strict, more difficult to comply with.

It would take a larger influx – if you are not already meeting the standards – of financial input to

meet these standards."  (Tr. at 11).

Dr. Jo Anne Green, Plaintiffs' expert witness, runs her own veterinary clinic and serves

as a veterinarian for two exotic animal parks in Oklahoma.  She has been a practicing

veterinarian for 15 years and is also accredited by the USDA.  (Tr. at 52).  Dr. Green testified

regarding the microchipping procedure, noting that it involves inserting a 14 gauge needle under the animal's skin, "which is quite painful." (Tr. at 55). She describes that many of these animals subject to the Act may require anesthesia to complete this microchipping procedure. She opined that subjecting an animal to anesthesia for the purposes of microchipping is "not a simple process at all" and is a "dangerous procedure." (Tr. at 55).

Dr. Green examined some of Plaintiff Huntsmen's animals, including an older African serval and a 16 year old African lion, and opined that "it would be cruel and unjustified to anesthetize those animals for the sole purpose of putting in a PIT tag. They are not going anywhere. They are on the USDA inventory. If anything was to happen to those animals, she would have a paper trail as to exactly where those animals went. She has a history of both of the animals. She knows where they came from and how long they have been there. I don't see any reason to PIT tag those animals." (Tr. at 61).

Dr. Green expressed concern that the serval was geriatric and had not had previous blood work done. Typically, "we can do a pre-anesthetic blood work panel, so we kind of know what state the kidneys, the liver, the hearts and the lungs are in before we touch the animal with anesthesia. I would consider it malpractice to put this serval under anesthesia. She probably would not survive the event." (Tr. at 59). With respect to the lion, it too was older and "lions, particularly, are difficult anesthetic patients. I would not be willing to put that animal under anesthesia." (Tr. at 60).

Polly Britton, legislative agent for the Ohio Association of Animal Owners ("OAAO"), which is "a grassroots organization of people with an interest in owning animals of any type, whether they're exotic or domestic." (Tr. at 94). She testified that it is the OAAO's position

that their animals are "our private property, bought and paid for and cared for by our members."

She noted that philosophies of members of the OAAO disagree with those of the AZA and ZAA.

(Tr. at 94-95).  She further testified regarding the difference in caging standards required by the

ZAA and the temporary rules under the Act.  She referenced a document she prepared comparing

the standards.  (*See* Bates 00646; Tr. at 97-98).  She noted specifically the difference in caging

requirements for hyenas, "under the emergency rules, there is a 5,000 square feet versus the

ZAA standards of 600 square feet."  (Tr. at 99).  Ms. Britton was on the governor's task force

that discussed these emergency rules and explained that the purpose behind these stringent

requirements was "they would be so strict that owners could not, or would not, be able to keep

their animals."  (Tr. at 99).

Mr. Zody, Chief of the Division of Wildlife within the Ohio Department of Natural

Resources testified regarding the issuance of a Wildlife Rehabilitation Permit, one of the

exemptions under the Act.  (Tr. at 226-27).  He described that under Ohio law, the Chief is

delegated with the authority over native wildlife and "we have certain permits that can be issued

to private individuals or non-profits to possess native wildlife."  (Tr. at 227).  Some native

wildlife that are on the dangerous list of the Act include: black bear, timber rattlesnake, eastern

massasauga rattlesnake, copperhead snake and bobcat.  (*Id.*).  He described two levels of permits

that individuals could request, including a level one which may involve someone finding an

orphan baby racoon and they want to care for it; and a level two, which requires more education

and training, that allows individuals to care for larger animals, such as a coyote or deer.  The

rehabilitation permit is "designed only for the temporary holding of injured or orphaned species

with a goal of either re-releasing those animals back into the wild or if an animal is too severely

injured or imprinted by humans to where it can't be re-released, it would have the possibility of being euthanized or if it is not too severely injured, but it still can't be released back into the wild, then that animal could then be transferred to the holder of an Education Permit."  (Tr. at 228).

Defendants presented the following witnesses:  Dr. Randall Junge, D.V.M., Vice-President of Animal Health, Columbus Zoo and Aquarium and The Wilds; Dr. Paul Stull, D.V.M., Assistant Chief, Division of Animal Health, Ohio Department of Agriculture; Dr. Tony Forshey, D.V.M., Chief, Division of Animal Health, Ohio Department of Agriculture; and Matthew J. Lutz, Sheriff of Muskingum County, Ohio.

Dr. Junge oversees animal health for the Columbus Zoo and The Wilds.  He testified that he has experience with most all the dangerous wild animals specifically listed in the Act (Ohio Rev. Code § 935.01(C)(1) - (20) and (L)(1)-(4)) either in his current position or in his previous position in Missouri.  (Tr. at 253-56).  Dr. Junge testified about the microchipping or PIT-tagging procedure, including displaying a microchip and the syringe used to insert the microchip.  (*See* Defs Exhs. 228 and 229).  Dr. Junge routinely microchips all animals, with the exception of fish.  (Tr. at 257-59).  However, Dr. Junge stated "I would never anesthetize an animal specifically for microchipping."  (Tr. at 262).  But, "if an animal has been anesthetized for a procedure or an examination and if it does not have a microchip, it would be done at that time." (*Id*.).

Dr. Junge described that for animals that are microchipped without anesthesia, "it is not a painful procedure."  (Tr. at 262).  He has not noticed anything traumatic happen to an animal during this procedure.  (*Id*.).  Further, he has not observed where animals have suffered sterility

-15-

or any serious injury as a result of having a PIT tag placed under their skin.  (Tr. at 266).  Dr. Junge also explained his experience with the use of anesthesia and deciding what type to administer "usually relates to the animal type.  For instance, if an animal is large and dangerous, it will be anesthetized by injection because that's administered with a dart.  The animal – we don't have to physically restrain the animal to potentially injure it or ourselves. . . .  We would use just injectable anesthesia for short procedures, something that was less than 30 minutes.  If their procedure needed to be prolonged longer than that, for instance, if the animal needed extensive surgery, then it would go into gas anesthesia."  (Tr. at 266-68).

Dr. Junge opined that the benefits to microchipping are providing "undisputable identification.  Many animals are clearly differentiated by their appearance or their behavior or their size.  But in many cases, there may be animals that aren't clearly identifiable, and the microchip, then, makes that conclusive."  (Tr. at 280).  He further testified that the dangerous wild animals listed in the Act, such as alligators, bears, tigers, lions, and snakes, pose a threat to human life.  (Tr. at 281-84).

Dr. Junge, when questioned by the Court, stated that he has anesthetized geriatric animals.  He stated "[w]e anesthetize geriatric animals regularly, not just for microchipping but for routine exams.  So anesthesia of a geriatric animal takes more care and more consideration, but it is not contra-indicated."  (Tr. at 299).

Dr. Stull, with the Ohio Department of Agriculture, testified that he was a practicing veterinarian for 45 years, working in one of the largest practices in Ohio, with thirty percent of his practice on exotic animals.  He is considered the leading expert on exotic animals within the Division of Agriculture.  (Tr. at 308).  Based on his experience, he stated that "microchipping

animals advances the interests of public protection, public health, animal health and animal welfare.  (Tr. 310-11).  Further, "microchipping provides a means of traceability for any animal that's microchipped, be it an exotic animal, a dangerous wild animal, a domestic livestock animal, a horse, a dog or a cat or whatever.  And being able to trace where an animal has been, where it is and where it might go is critical in disease control.  We have been fortunate in this country that we have done a really good job of that, and we don't have too many problems.  And much of that is due to traceability."  (Tr. at 311).

Dr. Stull has personally implanted microchips in animals subject to this Act and has not observed any problems with microchipping.  (Tr. at 310-12).  He stated, "I have microchipped many animals who didn't even notice anything was happening" such as ferrets, dogs, and cats. (Tr. at 312-13).  He did acknowledge that he has observed some animals in distress if trying to anesthesize and/or microchip, specifically chimpanzees at the Tampa zoo.  (Tr. at 313).

Dr. Stull also discussed his experience with the use of anesthetic on many animals in his practice, including animals covered by this Act, such as venomous snakes, alligators, felines, and primates.  He opined, like Dr. Junge, that the type of anesthesia depends on the animal.  (Tr. at 314-16).  He notes that he has anesthetized geriatric animals and that it may cause you to use different anesthetic protocol, but if there is no other physical problem, then anesthesia is ok.  (Tr. at 324).

Dr. Stull countered Dr. Green's testimony that some of Plaintiff Huntsmen's animals should not be anesthetized because of age.  He opined that age and arthritis are not sufficient reasons not to subject an animal to anesthesia.  (Tr. at 326).  However, he did not personally examine these animals.

-17-

Dr. Stull testified regarding the emergency rules adopted by the State that address the care of animals, housing, environment, nutrition, medicine and other health related parameters. He described that the rules are a result of committees formed by a wide variety of experts, including veterinarians, individuals with expertise in this area, and exotic animal owners. (Tr. at 326-28).

Dr. Stull stated that he is familiar with AZA and ZAA, in that he was a former member of AZA and is currently an associate member of ZAA, joining this year. (Tr. at 330). He described that he is a member for educational purposes, "to get their literature, get on their website and that sort of thing and learn as much about them as I could." (*Id.*).

Dr. Stull was questioned about all the exemptions under the Act and opined that the State has some assurance that under these exceptions, individuals will be meeting "at least some sort of basic level of care that they have to meet for the safety of the animals." (Tr. at 332). He further opined concerning the risks that wild animals may pose to the public, such as diseases that animals can transmit to humans, including rabies, herpes B, salmonella, and zoonotic diseases. Additionally, many of these wild animals can pose a fatal threat to humans. He stated that "any wild animal is unpredictable." (Tr. at 333-36).

Dr. Stull acknowledges that there is no medical waiver provision to object to the microchipping requirement. And when asked if there is a possibility that an animal could not be anesthetized for purposes of microchipping, he said, "I don't know for sure. I would have to examine that animal." (Tr. at 398).

Dr. Stull did acknowledge that there are alternatives to microchipping to identify animals, including tatooing, implant wires, color-coded polymers, ear tagging, and photographs. (Tr. at

433-34).  But he stated that "tatoos fade" and "ear tags are not uncommonly removed, either on purpose or accidentally."  (Tr. at 434).  He stated that although alternatives were considered, "[i]t's generally agreed among all the experts in the industry, across a wide spectrum, everything from laboratory animals to wild animals, biologists working in the field, veterinarians in private practice, other interested parties, it's pretty much agreed that the state of the art, as it is now, is that microchipping is the best way to go."  (Tr. at 438-39).  He further testified that just like with vaccinations, a doctor of veterinary medicine should administer the implantation of the microchip.  (Tr. at 438-39).

When questioned about the difference in the Act about the opt out provision for sterilization, but none for microchipping, he opined that sterilization is a surgical procedure and "in terms of the aggressiveness of the treatment that has to be given to the animal or the procedure that the animal is subjected to," there is no comparison as to how that compares to implanting a microchip under the animal's skin subcutaneously.  (Tr. at 433-44).

Sheriff Matthew Lutz, Muskingum County Sheriff, testified regarding the incident at the home of Terry Thompson in Zanesville, Ohio, on October 18, 2011.  He described in detail the incident that ensued as a result of the release of 56 dangerous wild animals, including the need to have to shoot most of the animals in order to protect the public.  He stated that this was his only experience with a massive exotic animal release, but he did have previous experience with the Thompson farm.  He did acknowledge that no one was injured as a result of this incident.  (Tr. at 357-58).  He further stated that he does not know whether we can prevent such an incident from ever happening again, but he believes that the Act "would make it better for the public safety to handle a response like this."  (Tr. at 355).  Specifically, he opined that under the Act, "it gives

you a set of guidelines and restrictions. . . such as inventory lists, containment fences, routine scheduled visits, things we didn't have back in October of 2011, that would help in response to public safety."  (Tr. at 356).

Dr. Forshey, Chief of the Division of Animal Health with the Ohio Department of Agriculture testified that he is generally responsible for supervising the statutory requirements of the Act, including inspections, animal disease control, etc.  (Tr. at 448).  He admitted that he is not an expert with exotic animals, but Dr. Stull his assistant chief is his advisor with respect to exotic animals.  (*Id*.).

Dr. Forshey provided general background information regarding the enactment of the Act at issue in this case.  The Act required registration of all dangerous wild animals subject to the Act by November 5, 2012.  (Tr. at 450).  He described a fairly extensive outreach and education process to notify individuals of the new registration requirements set by the Act.  (Tr. at 450). He described that individuals had from September 5, 2012, until November 5, 2012, to register their animals, which included implanting a microchip into each of them.  (Tr. at 451).  He noted that some individuals have informed the Department of Agriculture that "they were having some trouble finishing up the microchipping requirement or some complications about scheduling and those kinds of things."  (Tr. at 458).  And he said that "[w]e want to help people in any way we can to help them to become compliant with the law. And, so if they were having trouble getting a veterinarian scheduled or that sort of thing, we would give them timelines and work with them to become compliant."  (Tr. at 458).  He stated that there were approximately 18-20 incomplete forms that they worked with those individuals to get them into compliance.  (*Id*.).  He acknowledged that there is no waiver provision from the microchipping.  (Tr. at 481).

-20-

Dr. Forshey testified that the Department of Agriculture has created a database of all owners of these dangerous wild animals subject to the Act from the information provided by the owners on the registration form.  He stated that this data is important so the Department can trace the animal and see where the animal came from, how it has been cared for, the treating veterinarian, etc.   (Tr. at 463).

Dr. Forshey also discussed that there was an ad hoc committee comprised of veterinarians, zoos, USDA, global federations, etc. established to evaluate nutrition, care, housing, etc. of animals that ultimately led to the temporary care standards.  He stated that those standards were then brought before the dangerous wild animal advisory board, put in rule form, and adopted on November 27, 2012.  (Tr. at 464-65).  He stated that the time period to comply with these standards is 90 days.  (Tr. at 465).

Dr. Forshey described that the Department of Agriculture's role in enforcing this Act will be to conduct investigations by inspectors and vets in the field, and if a violation is found, to issue a notice of violation.  The animal owner will be offered a section 119 hearing to contest the violation.  This investigation and enforcement will not begin until January 1, 2014.  (Tr. at 472-74).

Dr. Forshey stated that the Act does not compel animal owners wishing to retain their animals to join AZA or ZAA.  He suggested that if an individual wants to retain ownership of animals, obtain a permit.  (Tr. at 475).

Plaintiffs called John Moore, on rebuttal, to discuss the incident at the Thompson farm in Zanesville.  He knew Terry Thompson for 20 years and was the caretaker of the animals for the last five years.  (Tr. at 492).  He described that he was called on the evening of October 18,

2011, by Marion Thompson, Terry's wife, asking him to go check on reports of a lion loose on

their property.  (Tr. at 493).  When he arrived at the property, he observed a number of the

animals were already shot.  (Tr. at 494).  He stated that the animals that he saw were "just

milling around" and were "confused."  (Tr. at 495-96).  He further stated that some were

"sunbathing" and were not exhibiting any violent behavior.  (Tr. at 497).  He further described

that one lioness was still in her cage, so he shut the door and locked it.  (Tr. at 498).  He stated

that he told the deputies that he could put some of the animals back, at least the 12 baby tigers

and lions because they were trained to walk with a leash.  (Tr. at 501).  He stated that the

deputies asked him to start putting together a list of what animals were there, how many of each

species, names, etc.  He described that he thought "now we're getting somewhere; we're really

going to at least put some of them away."  Then, "the next thing, a truck load of deputies come in

with assault rifles and stuff.  And that's when it all took off."  (Tr. at 502).  He described them

shooting at a lion that was just laying there and also shooting at animals that were still in cages,

including the lion he had locked up.  (*Id.*).  Mr. Moore stated that he told Sheriff Lutz, "look, we

could put some of these animals back."  But that the Sheriff said, "it's a public-safety thing, you

know."  (Tr. at 504).

## II.    STANDARD OF REVIEW

Plaintiffs move this Court for a temporary restraining order and preliminary injunction

pursuant to Rule 65(b) of the Federal Rules of Civil Procedure.  Rule 65(b) permits a party to

seek injunctive relief to prevent immediate and irreparable injury.  A temporary restraining order

is an extraordinary remedy whose purpose is to preserve the status quo.  The factors considered

in granting a temporary restraining order or a preliminary injunction and permanent injunction

are similar in nature.  In the Sixth Circuit, it is well-settled that the following factors are to be considered in determining whether a temporary restraining order is necessary:

> (1) Whether the movant has shown a strong or substantial likelihood or probability of success on the merits; (2) Whether the movant has shown irreparable injury; (3) Whether the issuance of a preliminary injunction [TRO] would cause substantial harm to others; and (4) Whether the public interest would be served by granting injunctive relief.

*Leary v. Daeschner,* 228 F.3d 729, 736 (6th Cir. 2000) (*citing McPherson v. Michigan High Sch. Athletic Ass'n,* 119 F.3d 453, 459 (6th Cir. 1997) ( *en banc* ), *quoting Sandison v. Michigan High Sch. Athletic Ass'n,* 64 F.3d 1026, 1030 (6th Cir.1995)). These four considerations are not required elements of a conjunctive test, but are rather factors to be balanced. *Michigan Bell Tel. Co. v. Engler,* 257 F.3d 587, 592 (6th Cir. 2001) (no single factor is determinative.); *Monongahela Power Co. v. Schriber,* 322 F.Supp.2d 902, 918 (S.D. Ohio 2004).

The decision whether or not to issue a preliminary injunction falls within the sound discretion of the district court.  *See Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982).  Plaintiffs are entitled to a permanent injunction only upon showing after a trial on the merits "(1) a continuing irreparable injury if the court fails to issue the injunction, and (2) the lack of an adequate remedy at law."  *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998) (citing *Dayton Christian Sch., Inc. v. Ohio Civil Rights Comm'n*, 766 F.2d 932, 961 (6th Cir. 1985).  Moreover, Plaintiffs must establish their case by clear and convincing evidence.  *Damon's Rests., Inc. v. Eileen K. Inc.*, 461 F. Supp.2d 607, 621 (S.D. Ohio Aug. 30, 2006).  To meet this burden, the movant's evidence "must more than outweigh the [opposing] evidence," but must also "persuade the court that its claims are highly probable."  *Id.*

**III.    DISCUSSION**

Plaintiffs, exotic animal owners, initiated this case against Defendants, enforcers of the Act, seeking to enjoin enforcement of the Act based on the following alleged constitutional violations: (1) violation of the First Amendment right of association by compelling Plaintiffs to join and fund private organizations such as the AZA or ZAA; (2) violation of their procedural due process rights because the Act does not provide a procedure for objecting to or obtaining an exemption from microchipping their animals; and (3) the microchipping requirement is a taking without compensation in violation of the Fifth Amendment.  Plaintiffs desire to avoid seizure and retain possession of their business and animals without (1) threatening their health through microchipping them; (2) being forced to join a private organization whose views they disagree with; (3) paying to the state fees and fines that exceed the value of the animals and business. The Court will address each of these claims in turn.

**A.    First Amendment – Freedom of Association**

Plaintiffs allege that to "retain their property rights in their animals," the Act "forc[es] Plaintiffs to associate with and fund the speech and activities [of] the AZA or the ZAA in violation of the First Amendment."  (Compl. ¶ 78).  The First Amendment to the United States Constitution specifically provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

The United States Supreme Court has "sustained First Amendment challenges to allegedly compelled expression in two categories of cases:  True 'compelled-speech' cases, in

which an individual is obliged personally to express a message he disagrees with, imposed by the government; and 'compelled-subsidy' cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity." *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 557 (2005).

Neither of these types of cases apply to the case at bar.  Contrary to Plaintiffs' allegations, the Act does not force membership in either the ZAA or the AZA.  Rather, one exception to the ban on dangerous wild animals is to meet the accreditation requirements of organizations like the AZA or ZAA.  In addition to this exception, there are thirteen other exceptions including:  facilities accredited by the AZA or the ZAA; research facilities as defined in the federal Animal Welfare Act; research facilities accredited by the Association for the Assessment and Accreditation of Laboratory Animal Care International; a circus; a wildlife sanctuary; a wildlife rehabilitator permitted by ODNR; a person issued a permit by ODNR pursuant to Ohio Rev. Code § 1533.08 for scientific or educational use; a person issued a permit by ODNR pursuant to Ohio Rev. Code § 1531.25 for native threatened species; a veterinarian providing temporary care; a person transporting a dangerous wild animal or restricted snake through the state; an education institution displaying a dangerous wild animal as a sports mascot; a mobility impaired person possessing certain primate species; a deaf person possessing certain primate species; and a blind person possessing certain primate species.  *See* Ohio Rev. Code § 935.03(B).  Just because Plaintiffs may not qualify for any of the other exemptions does not mean that the Act compels Plaintiffs to qualify for the exemption for accredited zoological organizations by joining the AZA or the ZAA.

The most likely exception for persons wanting to retain their wild animals is to seek a

wildlife shelter permit and Plaintiffs are not required to join any organization to obtain this

permit.  However, Plaintiffs argue that seeking the permit is not a viable alternative because one

requirement to obtain the permit is registration and implanting a microchip into the animals.

Plaintiffs contend that this is harmful to the animals.[6]  Plaintiffs argue that they have "no other

choice" but to join the AZA or the ZAA rather than submit to the registration of their animals

(Pls.' Mot. at 4).  Regardless of the safety of the microchipping, options are provided under the

Act.  Plaintiffs' choice is self-imposed and not compelled by the Act.[7]

Defendant-Intervenor states, and the Court agrees that this Act is a "far cry" from the

compelled speech in the cases cited by Plaintiffs, such as *Wooley v. Maynard*, 430 U.S. 705, 714

(1977), and *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624 (1943).  (Intervenor's Response

at 10).  "There is nothing in this case approaching a Government-mandated pledge or motto that

the [Plaintiffs] must endorse."  *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*,

547 U.S. 47, 62 (2006) (referencing two seminal compelled speech cases, which involved

"forcing a student to pledge allegiance" and "forcing a Jehovah's Witness to display the motto

'Live Free or Die'" on his license plate).

The Court acknowledges Plaintiffs' concern in the discrepancies in the caging and

general care requirements between what individuals have to meet under the Act's emergency

rules and what members of the ZAA have to meet.  Testimony from Polly Britton, the legislative

---

[6] The safety of microchipping will be discussed in relation to Count II, the due process claim.

[7] Intervenor Humane Society makes a notable analogy: "Plaintiffs' argument is akin to someone challenging a state law prohibiting the possession of narcotics on the grounds that the statute's exemption for licensed physicians somehow requires them to go to medical school." (Intervenor's Response at 8).

agent for the Ohio Association of Animal Owners highlighted these discrepancies and generally described the new emergency rules as very stringent, whereas the requirements for the ZAA are much less stringent. She prepared a document (Bates # 00646), comparing the differences. (Tr. at 97-99). Ms. Britton served on the task force appointed by Governor Kasich to discuss the possible regulations. She referenced statements by Ohio Department of Agriculture officials during the task force meetings that the intent of rules is that "they would be so strict that owners could not, or would not, be able to keep their animals." (Tr. at 99). Despite the concern over the affect that these rules will have, whether intended or unintended, again, Plaintiffs do have options under the Act to retain their animals. They must meet various regulations to do so, albeit some very stringent requirements, but nonetheless Plaintiffs do have options. There is no compulsory association under this Act. Accordingly, the Court finds that Plaintiffs have failed to establish that the Act compels speech or association in violation of Plaintiffs' First Amendment rights.

### B.  Fourteenth Amendment – Due Process

Plaintiffs argue that the Act fails to afford adequate procedural due process in accordance with the Fourteenth Amendment to the United States Constitution and Section 16, Article I of the Ohio Constitution. The Fourteenth Amendment Due Process Clause generally prohibits state and local governments from depriving persons of life, liberty, or property without certain steps being taken to ensure fairness. Section 1, Article 1 of the Ohio Constitution provides: "All men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and seeking and obtaining happiness and safety." Additionally, Section 19, Article I states "Private

property shall ever be held inviolate, but **subservient to the public welfare**."  (Emphasis added).

The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property.  *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972).  "Property interests are not created by the Constitution."  *Id.* at 577.  "Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law. . .."  *Id.*  "In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest."  *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009) (internal quotation marks omitted).

### 1.        Property Interest Implicated

Plaintiffs assert primarily that the requirement for microchipping and secondarily, that the sterilization of each male animal to obtain a permit, does not afford adequate due process. Plaintiffs challenge that there is no procedure for objecting to this microchipping requirement, despite the danger that it poses to the animal.  (Pls' Mot. at 13-14).

In making this argument, Plaintiffs contend that their animals are private property and therefore they have a fundamental right to own and possess their private property under Ohio law, citing *Toledo v. Tellings*, 114 Ohio St.3d 278 (2007) ("It is undisputed that citizens enjoy the right to own dogs"); and *State v. Anderson*, 57 Ohio St.3d 168 (1991) ("To many, a pet dog is as important and as loved as *** human members of the family").  In Ohio, these "venerable rights associated with property" are not confined to the mere ownership of property.  Rather, the

Supreme Court recently acknowledged that "[t]he rights related to property, i.e., to acquire, use, enjoy, and dispose of property, are among the most revered in our law and traditions." *Norwood v. Horney*, 110 Ohio St.3d 353, 361-61 (2006).  Plaintiffs also reference cases implicating property uses by businesses.  The Ohio Supreme Court has acknowledged "the right to do business is a right equally sacred to free speech." *Eastwood Mall v. Slanco*, 68 Ohio St.3d 221 (1994).

The Court acknowledges Plaintiffs argument that the Ohio Supreme Court has recognized a special relationship between humans and dogs.  However, such property rights are not without limitation.  The Ohio Supreme Court has recognized that "dogs are private property to a qualified extent," in that they are "subject to the state police power" and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for protection of its citizens." *City of Toledo*, 114 Ohio St.3d 278 (2007).  Courts have held that ownership of a dog does not implicate a fundamental constitutional right.  *See Am. Canine Found. v. City of Aurora*, 618 F. Supp.2d 1271, 1278 (2009); *see also Colorado Dog Fanciers, Inc. v. City and County of Denver*, 820 P.2d 644, 651 (Colo. 1991).  In *Colorado Dog*, the court held that "dogs are accorded qualified property status and are subject to the proper exercise of police power for the protection of the public's health, safety, and welfare." *Id.* at 653 (citing *Stone v. Mississippi*, 101 U.S. 814, 818 (1879)).

Defendants assert, and the Court agrees, that Plaintiffs cannot claim an "entitlement" to possession of a dangerous wild animal where the ownership of such animals is prohibited or otherwise restricted.  Defendants reference several cases out of Connecticut, Iowa, and California where restrictions on animal ownership withstand constitutional challenges.  (Defs'

Response at 12).  *See Kent v. Polk Cty. Bd. of Supervisors*, 391 N.W. 2d 220, 225-26 (Iowa 1986) (ban on dangerous animals and denial of permit did not violate procedural due process and did not deprive owner of property interest in lion); *see also Concerned Dog Owners of Calif. v. City of Los Angeles*, 194 Cal. App.4th 1210, 1230 (2011) (no constitutional right to keep dog or cat unaltered from spaying or neutering).  Specifically, in *Pinto v. Connecticut Dept. of Envir. Protection*, 1988 U.S. Dist. LEXIS 4375 (D. Conn., March 24, 1988), the Court found that Plaintiffs have no legitimate claim of entitlement to the possession of the tiger under state law because [it] prohibits the possession of tigers in Connecticut altogether."

Similarly, and for purposes of the case at bar, Plaintiffs have a limited property interest in their exotic animals or dangerous wild animals (as described in the Act), such that a fundamental constitutional right is not implicated.  Accordingly, based on the limited property interest involved, in order to withstand scrutiny under the Due Process Clause, the Act must bear a rational relationship to a legitimate legislative goal or purpose.  *See Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 124 (1978).  "In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld. . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification."  *FCC v. Beach Communication, Inc.*, 508 U.S. 307, 313 (1993).

### 2.    Rational Basis

Plaintiffs bear the burden of proof to show beyond a reasonable doubt that there is no rational basis for this Act.  *See Harrah Ind. Sch. Dist. v. Martin*, 440 U.S. 194, 198 (1979) (statutes that do not encroach upon fundamental rights "[are] endowed with a presumption of

legislative validity, and the burden is on [the challenger] to show that there is no rational connection" between the enactment and a legitimate government interest."); *see also Craigmiles v. Giles*, 312 F.3d 220, 223-24 (6th Cir. 2002). Plaintiffs' primary argument is that the Act requires implantation of a microchip in each animal without any consideration that some animals may not physically be able to withstand the microchipping process, and there is no opportunity to be heard on this issue. Plaintiffs contend that forced implantation of the microchip into the animal, against the will of the owner, constitutes a permanent physical invasion of the owners' property. Plaintiffs presented testimony from Dr. Jo Anne Green, a licensed veterinarian from Oklahoma, that the animal owners' concern with the microchipping process is justified. (Tr. at 63). Dr. Green specifically referenced two of Plaintiff Huntsmen's animals that she personally examined: an African serval and an African lion. She opined that the serval is very old and has not had any previous blood work done (as compared to domestic pets that can have a "pre-anesthetic blood work panel" done to know what state the kidneys, liver, hearts and lungs are in before giving that animal anesthesia). She concluded that "it would be malpractice to put this serval under anesthesia. She probably would not survive that event." (Tr. at 59).

Similarly, with respect to the lion, it is 16 years old, weighing approximately 400 to 600 pounds, if not more. She stated that "lions, particularly, are difficult anesthetic patients. I would not at all be willing to put that animal under anesthesia." (Tr. at 60). Finally, she concluded that "I believe it would be cruel and unjustified to anesthetize those animals for the sole purpose of putting in a PIT tag. They are not going anywhere. They are on the USDA inventory. If anything was to happen to those animals, she would have to have a paper trail as to exactly where those animals went. She has a history of both of the animals. She knows where they

came from and how long they have been there.  I don't see any reason to PIT tag those animals."
(Tr. at 61).

Even Defendants own witness, Dr. Junge with the Columbus Zoo, opined "I would never anesthetize an animal specifically for microchipping."  (Tr. at 262).  Rather, the microchipping could be done when an animal is anesthetized for another reason.  (*Id*.).

Despite this compelling testimony regarding the concern over the microchipping process and especially the potential harm to geriatric animals, Plaintiffs have failed to establish that there is no rational basis for this Act.  To pass rational basis scrutiny, ordinances need not be supported by scientific studies or empirical data; nor need they be effective in practice.  Rather, "[i]t is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it."  *Kutrom Corp. v. City of Center Line*, 979 F.2d 1171, 1174 (6th Cir. 1992) (quoting *Williamson v. Lee Optical Co.*, 348 U.S. 483, 487-88 (1955)); *see also Craigmiles*, 312 F.3d at 224 ("[W]e will be satisfied with the government's 'rational speculation' linking the regulation to a legitimate purpose . . . .") (quoting *FCC v. Beach Comm'cns, Inc.*, 508 U.S. 307, 313 (1993)).

Defendants and the Intervenor have sufficiently set forth a legitimate government purpose behind the enactment of this Act–to protect animal welfare and public safety from threats posed by certain dangerous wild animals.  Defendants presented testimony that these wild animals subject to the Act are dangerous and the Act is necessary to protect the general public from these wild animals.  (*See e.g.,* Tr. at 333-36, Dr. Stull stated "[a]ny wild animal is unpredictable").  Counsel for Defendants summed up this case stating "[w]e have people that are the owners of private property, personal property that are unhappy with the legislative choices

-32-

that have been made by the Ohio Legislature to try to advance certain legitimate – indeed compelling – public interests, that are protecting public health and public safety, that are protecting animal health and animal safety."  (Tr. at 520-21).

Defendants reference the United States Supreme Court case of *Andrus v. Allard*, 444 U.S. 51 (1979), in support of their argument that it would be a practical impossibility for government to function if it was unable to regulate private property or had to compensate people every time a public law somehow impacted the use of private property.  (Defs' Response at 18-19; *see also* Tr. at 526).  Use of private property may be regulated in the public interests if it is done so in a constitutional manner.  Defendants argue, and the Court agrees, that the regulation of Plaintiffs' property in this case has been done in a constitutional manner.

The evidence shows that some of the Plaintiffs have made a deliberate choice not to fully comply with the registration requirements of the Act, which includes implanting the animals with a microchip.  There are, however, many registrants that have submitted registrations, have complied with the registration process and are working through the process to obtain a permit that the Act allows under certain conditions for them to retain these animals and to continue to derive benefit from the animals.  (Tr. at 458).

Plaintiffs argue that at the very least, before they are required to implant a microchip into their animals, they should be permitted a hearing.  Plaintiffs reference the *Mathews* test, which requires the Court to consider "the private interest that will be affected by the official action"; "the risk of an erroneous deprivation of such interest, through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and "the government's interest, including the function involved and the fiscal and administrative burdens that the

-33-

additional or substantive procedural requirements would entail." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).

"[T]here can be no dispute that an animal owner has a substantial interest in maintaining his rights in a seized animal. . . . Animal owners [ ] have a substantial interest in their 'mere' pets." *Siebert v. Severino*, 256 F.3d 648, 660 (7th Cir. 2001) (internal quotation marks omitted); *see also Louisville Kennel Club, Inc. v. Louisville/Jefferson Cnty. Metro Gov't*, 2009 U.S. Dist. LEXIS 92328, at *10 (W.D. Ky. Oct. 2, 2009) (interpreting other sections of the LMCO chapter on animals to hold that "pet owners clearly have a property interest in their animals" and that "the government is not permitted to deprive an animal owner of his property without due process of law").

There is no question that "[d]ue process requires notice of the charges and a meaningful opportunity to contest the evidence." *Morrison v. Warren*, 375 F.3d 468, 473 (6th Cir. 2004). "Notice, of course, is one of the most fundamental aspects of due process." *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 638 (6th Cir. 2005). There is no dispute that if a violation of the Act occurs, the animal owner is provided notice and an opportunity to be heard at a Section 119 hearing[8] before an animal may be seized. Therefore, despite Plaintiffs' arguments to the contrary, the Act does have a procedure for objecting to or arguing for an exemption from the microchipping requirement. Or, at the very least, they will have an opportunity to provide an equitable defense to seizure of their property. Defendants' witness Dr. Forshey discussed this procedure, "once we issued a notice of violation, they would have the opportunity for a 119

---

[8] *See* Ohio Rev. Code §§ 935.20, 935.24; *see generally* Ohio Rev. Code § 119.

hearing; have 30 days to respond to that." (Tr. at 474).

It may seem more practical to have a hearing, or at the very least a procedure to object to the microchipping requirement at the time of registration, similar to that associated with the sterilization procedure.  However, before any animals will be seized, the owners do have a right to a Section 119 hearing.  Therefore, there is no constitutional violation of Plaintiffs' due process rights.

Counsel for the Intervenor even acknowledged that "if in the event that there was an animal where anesthesia was too risky and there was no other way to microchip that animal, if there were a citation for that being a violation of the law, at the time of the enforcement proceeding, that would be an *equitable defense* to that issue."  (Tr. at 535-36) (emphasis added). Therefore, Plaintiffs will be afforded a hearing, at which time they can defend why a specific animal was not microchipped.  Presumably, based on the testimony, if an animal must be anesthetized to insert a microchip and subjecting the animal to anesthesia would be detrimental to that animal's health, then that is an equitable defense to a violation of the Act.  The Act is silent as to any opt-out provision to the microchipping requirement and should the State find a need for such provision, it could be implemented by the Director with his rule making authority, rather than legislative action to amend the statute.  It is clear that the State envisioned the possibility that a microchip may be detrimental to an animal's health as set forth in Ohio Revised Code § 935.18(B), which specifically states, "Except for a microchip removed for purposes of a medical emergency by a veterinarian that is qualified to provide veterinary care to the dangerous wild animal, no person shall knowingly remove a microchip."

In addition to the Section 119 hearing, Defendants argue that the Act "affords adequate

procedural due process" because "[i]ndividuals currently in possession of dangerous wild animals were provided five months from enactment (June 5, 2012) and two months from the September 5, 2012 effective date of the Act to comply with the microchipping and registration deadline (November 5, 2012)."  "The Act also provides adequate notice by clearly identifying which animals are covered by the Act, thus minimizing the risk that an animal would be erroneously microchipped.  It is unclear what hearing process the State could provide before microchipping to further minimize the risk of an erroneous deprivation."  (Defs.' Response at 14).

The Court is empathetic to the Plaintiffs' situation in this case and especially to the difficulties faced in completing the microchipping requirement.  Although Defendants argued that the five months to implant the microchip was sufficient, there was testimony to the contrary.  Dr. Stull testified that a veterinarian should be the one to insert the microchip.  (Tr. at 438-39).  Therefore, the animal owners would have to find a veterinarian willing to perform the procedure and get it scheduled in a short time.  Defendants own witness, Dr. Junge, even testified that "I would never anesthetize an animal specifically for microchipping."  (Tr. at 262).  Therefore, if an animal would need to be anesthetized to insert the microchip, it would be best to wait until the animal is having another procedure done, such as a teeth cleaning or vaccinations, and insert the microchip at that time.

In light of the testimony and evidence before the Court and the fact that the investigation and enforcement provisions of the Act do not begin until January 1, 2014, the Court finds that so long as the animals are microchipped by January 1, 2014, they should not be found to be in violation of the registration and microchipping requirement.  To be clear, the Court has not

found a constitutional violation, but finds the Act ambiguous as to whether the microchipping

deadline should be strictly applied.  In fact, Defendants' witness Dr. Forshey, Chief of the

Division of Animal Health with the Department of Agriculture, testified that some individuals

notified the Department that "they were having trouble getting a veterinarian scheduled or that

sort of thing."  (Tr. at 458).  The Department was working with those individuals, allowing them

extra time, to get them into compliance.  (*Id*.).  Defendants have in essence acknowledged that

strict enforcement of the November 5, 2012, microchipping requirement was waived.  Therefore,

since the Department has allowed for some leeway as to this requirement, all applicants should

be given the same consideration.

After reviewing all the arguments of the parties and hearing the evidence presented at

trial, the Court concludes that there is sufficient evidence to establish a rational basis between

the Act regulating possession of dangerous wild animals and the State of Ohio's legitimate

interest in protecting the health and safety of the City's residents.  Therefore, Plaintiffs have

failed to prove that Defendants have violated their due process rights under the Ohio and United

States Constitution.

### C.      Fifth Amendment – Taking Without Compensation

Plaintiffs assert that application and enforcement of the Act effects a taking without

compensation in violation of the U.S. Constitution.[9]  The Takings Clause of the Fifth

Amendment to the U.S. Constitution provides: "[N]or shall private property be taken for public

use, without just compensation."  The United States Supreme Court has described two distinct

---

[9] The Court notes that Defendants raise the issue of whether Plaintiffs' takings claims should be dismissed for failure to seek compensation through state remedies.  For the purpose of its analysis of Plaintiffs' takings claims, the Court assumes that these claims are ripe for review.

classes of takings cases.  *Yee v. City of Escondido*, 503 U.S. 519, 522 (1992).  Where the government authorizes or requires the physical occupation of property (or actually takes title), the takings clause generally requires compensation.  *Id.* (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982)).  Where the government merely regulates the use of property, however, compensation is required only if considerations such as the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole.  *Id.* at 522-23 (citing *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 123-25 (1978)).  Thus, a "taking" may occur either by physical invasion or by regulation.  Furthermore, the Court notes that "[r]eal property, tangible property, and intangible property, all may be the subject of takings claims."  *Conti v. United States*, 291 F.3d 1334, 1338-39 (Fed. Cir. 2002) (citing *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992), *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003-04 (1984), and *Andrus v. Allard*, 444 U.S. at 65).

        In evaluating a takings claim, courts apply a two-part test.  *See Coalition for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 481 (6th Cir. 2004).  First, the court must examine whether the claimant has established a cognizable "property interest."  *Id.*  Second, where a cognizable property interest is implicated, the court must consider whether a taking occurred.  *Id.*  As discussed above, in reference to Plaintiffs' due process claim, limited or qualified property rights exist in connection with the ownership of dangerous wild animals. Therefore, for the purpose of this decision, the Court will focus its analysis on whether the Act effects a taking.

Plaintiffs assert two takings claims.  First, Plaintiffs allege that the forced implantation of microchips in their dangerous wild animals constitutes a permanent physical occupation of their property.  Second, Plaintiffs allege that the Act completely deprives them of all economic beneficial use of their dangerous wild animals, constituting a regulatory taking.  Defendants argue that the requirement that all registered dangerous wild animals be implanted with microchips is not a permanent physical occupation for the purpose of the application of the Takings Clause.  Defendants also argue that the Act does not result in a regulatory taking because the requirements of the Act do not deprive Plaintiffs of all economic use or value of their dangerous wild animals.  The Court will address Plaintiffs' takings claims in turn.

### 1.    Invasion of Property as Taking

"[O]ne of the most essential sticks in the bundle of rights that are commonly characterized as property" is the "right to sole and exclusive possession—the right to *exclude* strangers, or for that matter friends, but especially the Government."  *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 673 (1999) (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979)); *Hendler v. United States*, 952 F.2d 1364, 1374 (Fed. Cir. 1991) (emphasis in original) (citation omitted).  Consequently, a "permanent physical invasion, however minimal the economic cost it entails, eviscerates the owner's right to exclude others from entering and using her property-perhaps the most fundamental of all property interests."  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).  Here, Plaintiffs allege that their exclusive right to exclude others as to their possession of dangerous wild animals is compromised by the microchipping requirement.  Microchipping is a "permanent physical invasion" that "eviscerates the owner's right to exclude others from entering and using

-39-

her property."  (Compl. ¶ 118).

Under the Act, if a dangerous wild animal owner does not qualify for an exemption under Ohio Revised Code § 935.04,  the owner must have registered and microchipped the dangerous wild animal by November 5, 2012.  Then, in order to retain possession of the animal, the owner must obtain either a wildlife shelter permit or a wildlife propagation permit.  *See* Ohio Rev. Code § 935.04(D) and (E).  Plaintiffs characterize this requirement as a governmental physical invasion of property, subject to the Takings Clause.  Plaintiffs cite *Loretto*, *supra*, and *State ex rel. Gilbert v. City of Cincinnati*, 928 N.E.2d 706 (Ohio 2010), in support of their physical taking claim.  These cases, however, do not further Plaintiffs' physical taking claim.

In *Loretto*, the U.S. Supreme Court affirmed the traditional rule that a permanent physical occupation of property authorized by the government is a taking, and found a physical taking occurred when the government required landlords to allow cable provides to install equipment on their property.  *Id.* at 435.  In *Gilbert*, the Ohio Supreme Court found that repeated flooding of private property from government-owned sewer and water management systems constitutes a taking.  *Id.* at 713-14.  In contrast, the case at bar involves a statute that requires the implantation of an identification device into Plaintiffs' dangerous wild animals in order for them to retain possession of this personal property.  The procedure is undoubtedly at least minimally invasive to the animal, but this requirement is a function of government regulation of dangerous wild animals, not governmental physical appropriation or invasion.  Microchipping has almost no impact on an animal owner's use, enjoyment, or possessory interests.[10]  Courts have held that a

---

[10] As discussed with respect to the due process claim, there is concern that Plaintiffs' property could be fatally harmed if forced to insert a microchip into a geriatric animal because of the risk involved with anesthesia.  However, that is the exception.  The evidence showed that

spaying and neutering requirement for animals, which is arguable a more invasive procedure

than microchipping, did not effect a physical taking of property. *American Canine Foundation*

*v. Sun*, 2007 U.S. Dist. LEXIS 90004 (N.D. Calif., Nov. 27, 2007) (requirement to spay and

neuter dogs "regulates the use of dogs" and does not deprive owners of economic use). Further,

a permanent, physical taking does not result if an owner may keep an animal, even under

restricted use. *See City of Aurora*, 618 F. Supp.2d at 1279 (restriction on pit bulls "does not

result in a taking of physical property if a dog owner may keep the dog by obtaining a license

and complying with the minimum standards for keeping the dog"). Because there is no

governmental physical invasion of property, Plaintiffs' physical taking claim fails. Plaintiffs'

allegations under the Takings Clause are more appropriately analyzed as a possible regulatory

taking because the government is regulating the use of Plaintiffs' property.

### 2. Regulatory Taking

The Supreme Court has observed that "government regulation-by definition-involves the

adjustment of rights for the public good. Often this adjustment curtails some potential for the

use or economic exploitation of private property. To require compensation in all such

circumstances would effectively compel the government to regulate by purchase." *Andrus*, 444

U.S. at 65. The *Andrus* Court further noted: "'Government hardly could go on if to some extent

values incident to property could not be diminished without paying for every such change in the

general law.'" *Id.* (citing *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922), and *Penn*

*Central*, supra, 438 U.S., at 124). "The Takings Clause, therefore, preserves governmental

power to regulate, subject only to the dictates of 'justice and fairness' . . . There is no abstract or

_____

generally, implantation of a microchip is a minimally invasive procedure.

fixed point at which judicial intervention under the Takings Clause becomes appropriate. Formulas and factors have been developed in a variety of settings . . . Resolution of each case, however, ultimately calls as much for the exercise of judgment as for the application of logic." *Andrus*, 444 U.S. at 65 (citing *Penn Central*, 438 U.S. at 123-28).

A "property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers[.]" *Lucas*, 505 U.S. at 1027.  As to personal property, the U.S. Supreme Court provided this guidance: "And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, he ought to be aware of the possibility that new regulation might even render his property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)."  *Id.*  In other words, "the owner of any form of personal property must anticipate the possibility that new regulation might significantly affect the value of his business."  *Holliday Amusement Co. of Charleston v. South Carolina*, 493 F.3d 404 (4th Cir. 2007) (citing *Lucas*, 505 U.S. at 1027-28).  Thus, for the purpose of regulatory taking analysis, a distinction exists between personal and real property.

The keen observation in *Lucas* regarding personal property rings especially true as it relates to exotic animals owned as personal property because they are living creatures that pose unique threats to people, and thereby reasonably may be subject to onerous government regulation.  *See Sentell v. New Orleans & C.R. Co.*, 166 U.S. 698, 704 (1897) (noting that dogs are "subject to the police power of the state, and might be destroyed or otherwise dealt with, as in the judgment of the legislature is necessary for the protection of its citizens.");  *Nicchia v. New York*, 254 U.S. 228, 230 (1920) ("Property in dogs is of an imperfect or qualified nature and they

-42-

may be subjected to peculiar and drastic police regulations by the state without depriving their owners of any federal right.").

The Ohio General Assembly enacted sweeping legislation regulating the possession, transfer, and care of dangerous wild animals and restricted snakes.  This regulation of the use of property derives from the state's police power and its "high degree of control over commercial dealings."  *See Ohio Edison Co. v. Power Siting Comm.*, 383 N.E.2d 588, 592 (1978) (defining "police power legislation" as that "designed to protect public health, safety and welfare"); *Lucas*, 505 U.S. at 1027-28.  It is common knowledge that the animals covered under the Act are inherently dangerous, as they are not normally domesticated and pose unique threats to human life due to their physical and temperamental characteristics, including their strength, speed, and unpredictability.  As such, it is within the prerogative and function of the Ohio General Assembly, within constitutional parameters, to decide whether and how best to regulate such matters as the possession, care, and transfer of these animals.

The Court has heard extensive testimony regarding the costs that will be borne by Plaintiffs as it relates to the operation of the Act and the regulations thereunder concerning such matters as fees, caging requirements, and restrictions as to the ability to exhibit, breed, and sell these animals.  For example, Ms. Huntsmen testified that she will have to expend $116,290 to comply with the Act, and that the value of her animals will decrease from $73,400 to zero.  (Tr. at 32-36).  Mr. Wilkins described how he would not be able to meet the caging requirements in view of the square footage of his store, and that the breeding and selling restrictions of the Act as to the covered animals will significantly decrease his profits.  (Tr. at 220-21).  And Mr. Sawmiller described how the Act will cause the cessation of his business because he can no

longer exhibit his covered animals at fairs, festivals, and corporate events. (Tr. at 127).

Even though operation of the Act undoubtedly will increase the cost of ownership of dangerous wild animals and will devalue businesses or otherwise hinder economic activity to the detriment of certain dangerous wild animal owners, these circumstances do not effectuate a taking under the U.S. Constitution. *See Holliday Amusement Co. of Charleston, Inc., supra.* Additionally, the imposition of fees in connection with the Act are reasonable in view of the administrative obligations of Defendants in the enforcement of the Act. Accordingly, Plaintiffs' regulatory takings claim fails.

As a final matter, the Court notes that is sympathetic to the exotic animal owners who will not be able to retain possession of their beloved animals as a result of the operation of the Act, and it recognizes that this circumstance may lead to the severance of strong bonds between the animals and their owners. Additionally, imposition of the Act likely will have a negative impact on certain business owners. This is a consequence of the adjustment of rights as the legislature reasonably deems appropriate, in its effort to protect the public from dangers associated with the possession of exotic animals. However, it is inconsequential whether Plaintiffs, and for that matter the Court, agree with none, some, or all of the constitutionally permissible policy decisions of the Ohio General Assembly. Because Plaintiffs have not demonstrated any constitutional infirmity as it relates to the Act, their claims fail.

**D.** **Preliminary/Permanent Injunction Factors**

As set forth above, Plaintiffs have not established a likelihood or actual success on the merits. Given that Plaintiffs have failed to demonstrate a constitutional violation, the Court is unable to conclude that Plaintiffs are suffering from irreparable harm.

-44-

While the protection of constitutional rights is always a public interest, there has been no violation of constitutional rights here.  The Court has expressed concern with respect to the dangers facing some animals if forced to be anesthetized.  However, the ultimate interest implicated in this case is the public interest.  While the named Plaintiffs may be responsible dangerous wild animal owners, there are some that are not.  Defendants have highlighted in their briefing and during the hearing a number of incidents involving wild animals harming people.  The Court heard testimony regarding the incident in Zanesville, Ohio in September 2011, where 56 exotic animals were released.  The Court acknowledges that there was conflicting testimony on how best to handle the animals, especially considering that they were not acting violently.  However, the Sheriff was faced with the responsibility of protecting the public.  Had there been an inventory of the animals immediately accessible, that is now available under the Act, the incident may have been handled differently.

IV.     **CONCLUSION**

Based on the foregoing, the Court **DENIES** Plaintiffs' Motion for Temporary Restraining Order and Preliminary and Permanent Injunction.  Final judgment shall be entered in favor of Defendants.

The Clerk shall remove Document 3 from the Court's pending motions' list.

**IT IS SO ORDERED.**

*/s/ George C. Smith*
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**